# Richmond.

## MILLER, ETC. V. STATE ENTOMOLOGIST.

### November 18, 1926.

1. RED CEDAR TREES—*Code of 1919, Sections 885, 886, 893—Constitutionality of Statute.*—The constitutionality and validity of the act of 1914, page 49 (Code of 1919, section 885, *et seq.*), commonly known as the "cedar rust act" was established by *Bowman* v. *State Entomologist,* 128 Va. 351, 105 S. E. 141, and all objections to the constitutionality of the statute were concluded by that case whether brought to the attention of the court in that case or not.    In the instant case the Supreme Court of Appeals carefully reconsidered its holdings in the *Bowman Case* and saw no reason for changing the conclusion reached in that case.

2. STATUTES—*Constitutionality—Stare Decisis.*—If a statute is unconstitutional for any reason it is a void statute, and whenever a statute is enforced by a judgment or decree of a court, it is a judicial determination that the statute is a valid enactment and is free from all constitutional objections. If unconstitutional for any reason, whether assigned or not, the statute is void.

3. RED CEDAR TREES—*Constitutionality of the Act—Equal Protection Clauses of the Federal Constitution.*—The cedar rust act (Acts of 1914, p. 49, Code of 1919, section 885, *et seq.*) does not violate the equal protection clause of the Federal Constitution in that it cannot be put into operation except upon the initiative of ten freeholders. The freeholders are not given any power themselves to order the destruction of cedar trees, nor can they control the entomologist in the performance of his duties, or the circuit court of the county in the exercise of its functions.

4. RED CEDAR TREES—*Constitutionality of the Act—Equal Protection and Due Process of Law Clauses of the Federal Constitution—Request of Ten Freeholders.*—The written request of ten freeholders provided for in section 886 of the Code of 1919 (the cedar rust law), simply inaugurates a preliminary investigation which, at the instance of the owner of the cedar trees, will result in a judicial trial wherein both sides are allowed to introduce all legal evidence and the court is "authorized to pass upon all questions involved." This is not a denial of due process, or the equal protection of the law. After the freeholders have made the request in writing they have nothing further to do with the case.

5. RED CEDAR TREES—*Validity of the Act—Vagueness and Indefiniteness—* *"Locality."*—In the instant case the validity of the cedar rust law was attacked on the ground that the statute was invalid because of vagueness and indefiniteness. This attack was based upon the use of the word "locality" in section 886 of the Code of 1919. The statute is to be read as a whole, and when so read it is fairly plain that what was to be investigated was the existence of infected red cedar trees within two miles of an apple orchard, and there is no doubt or uncertainty about the use of the word "locality." The location of the cedars and their distance from an apple orchard or orchards is the subject of investigation, and this is the "locality" referred to in the statute.

6. RED CEDAR TREES—*Whether Law in Force in a Certain Magisterial District—Amendment of the Statute—Case at Bar.*—The original cedar rust act was approved March 4, 1914. Section one of this act (Code of 1919, section 885), declared infected cedars within one mile of an apple orchard to be a "public nuisance." Section two of the act (Code of 1919, section 886) provides for the destruction of such cedars within two miles of an apple orchard. This act was adopted June 14, 1920, for Lee magisterial district in Shenandoah county. Afterwards, Acts of 1920, page 370, amending section 885 of the Code of 1919, which was section one of the original act, went into effect. The amendment struck out the word "one" and substituted "two" before the word miles. After this amendment no action was taken by the supervisors of Shenandoah county and it was argued that the amendment operated as a repeal of the original act, and that there was no cedar rust act in force in Lee magisterial district of Shenandoah county.

   *Held:* That as, in the instant case, the cedar trees in question were within one mile of an apple orchard, there was no force in this argument.

7. STATUTES—*Intention.*—The object of judicial interpretation of a statute is to ascertain the intention of the legislature, express or implied, as the intent is the vital part of the statute.

8. STATUTES—*Repeal—Implication.*—Repeals by implication are not favored.

9. STATUTES—*Repeal—Amendment.*—An amendment of a statute operates a repeal of its provisions to the extent, and only to the extent, that they are changed by or are repugnant to, the amendatory act.

10. STATUTES—*Amendment—Repeal—Cedar Rust Law—Case at Bar.*—In the instant case the only change in the cedar rust law made by the amendment of March 16, 1920 (Acts of 1920, .p. 370), was the substitution of the word "two" for the word "one" in section 885 of the Code of 1919. The remaining sections on the subject were left unchanged. This did not in any way affect or change what had already been done under the original act, but simply extended the

area within which thereafter infected cedars should be deemed, *per se*, a public nuisance. As, in the instant case, there were several orchards within a mile of the infected cedars in question, there was no occasion to resort to the amendment extending the limit to two miles. The Supreme Court of Appeals did not decide whether in the instant case it would have enforced the amendment if the orchards in question were beyond the one mile but within the two mile limit, as it was not necessary to decide that question.

11. RED CEDAR TREES—*Destruction of all Trees—Case at Bar.*—In the instant case it was assigned as error that the court directed the destruction of all the red cedar trees on petitioner's land, whereas, in any event, no red cedar trees other than such as are or may be sources, harbor or host plants of cedar rust are included in the denunciation of the statute. The testimony showed that all red cedar trees in proximity to apple trees may be the source, harbor or host plants of cedar rust.

*Held:* That it was not necessary to wait for absolute infection before the cedars could be destroyed.

12. RED CEDAR TREES—*Damages—Diminution of the Market Value of the Owner's Land—Ornamental Value of the Trees.*—Where red cedar trees are destroyed under the provisions of the cedar rust act (Code of 1919, section 885, *et seq.*) the owner of the trees is not entitled to damages or compensation for diminution in the market value of his land resulting from such destruction.

13. RED CEDAR TREES—*Damages—Diminution of the Market Value of the Owner's Land—Constitutionality of the Act.*—The cedar rust law (Code of 1919, section 885, *et seq.*) is not void as in contravention of the fourteenth amendment of the Constitution of the United States, in that it does not provide for compensation for the diminution of the market value of the land from the destruction of the trees.

14. CEDAR RUST LAW—*Damages.*—The damages in contemplation of the cedar rust act (Code of 1919, section 885, *et seq.*) are such incidental expenses incurred by the owner by the interruption of his farming operations, by dragging or hauling the cedars over the sod or land in cultivation, by the burning of brush, by the trimming of the cedars and by the supervision of the work.

Error to a judgment of the Circuit Court of Shenandoah county, in a proceeding under the cedar rust statute. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*C. W. Bennick, D. O. Dechert,* and *Randolph Harri-son,* for the plaintiff in error.

*F. S. Tavenner* and *John R. Saunders, Attorney-General,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This is a proceeding, under the "cedar rust" statute, to cause the destruction, as a nuisance, of certain red cedar trees on the lands of the plaintiffs in error.   Sections 1, 2 and 9 of the original act (Acts 1914, p. 49), carried into the Code as sections 885, 886 and 893, are given in the margin.*

The cedars sought to destroyed grow wild, mostly on grazing lands, and are not propagated for commer-

---

*"*Section 885.    Red Cedar Trees; Public Nuisance.*—It shall hereafter be unlawful within this State for any person, firm or corporation to own, plant or keep alive and standing upon his or its premises, any red cedar tree, or trees (which are or may be) the source, harbor or host plant for the communicable plant disease commonly known as 'orange' or 'cedar rust' of the apple, and any such cedar trees, when growing within a radius of one mile of any apple orchard in this State, are hereby declared a public nuisance and shall be destroyed as hereinafter provided, and it shall be the duty of the owner or owners of any such cedar trees to destroy the same as soon as they are directed to do so by the State entomologist, as here-inafter provided."

"*Section 886.    Investigation by State Entomologist; when Trees to be De-stroyed; Notice to Owner.*—In any county in this State where the above men-tioned disease exists, or there is reason to believe it exists, it shall be the duty of the State Entomologist, in person or by an assistant, upon the request in writing of ten or more reputable freeholders of any county or magisterial district, to make a preliminary investigation of the locality from which said request is received, to ascertain if any cedar tree or trees in said locality are the source of, harbor or constitute the host plant for the said disease known as 'orange' or 'cedar rust' of the apple, and con-stitute a menace to the health of any apple orchard in said locality, and that said cedar tree or trees exist within a radius of two miles of any apple orchard in said locality.    If upon such preliminary investigation of the localities from which said request is received it shall appear that there are cedar trees which constitute the source, harbor or host plant of said disease, and that said cedar tree or trees exist within a radius of two miles of any apple orchard or orchards in said locality and constitute a menace

cial purposes.   They vary in height from mere sprouts
to shrubs or trees six or eight feet high and some of
them much higher.   The smaller ones are used to some
extent for "Christmas trees."   The chief use of those
of sufficient size is for fence posts.   Their utility or
commercial value is comparatively small.   The evi-
dence tends to show that the land is more valuable
without them; but, when properly trimmed and kept
in order, they possess, or are supposed to possess, a
scenic value.   They are, however, the deadly enemy
of certain very valuable commercial apples, so deadly
that one or the other must go, as no practical method
has been discovered whereby the cedar may be treated
so as to render it innocuous.   Many millions of dollars
have been invested in commercial apple orchards in
the State, and the industry has been developed to such
an extent that the State stands third or fourth in the
United States in the production of commercial apples.
This development has been especially marked in the

to the health of said apple orchard or orchards, the State Entomologist
or his assistant shall give notice in writing to the owner or owners of said
cedar tree or trees to destroy the same; such notice shall contain a brief
statement of the fact found to exist whereby it is deemed necessary or
proper to destroy said cedar trees and call attention to the law under which
it is proposed to destroy said cedar trees, and the owner or owners shall,
within such time as may be prescribed in such notice by the State Entomolo-
gist, cut down and destroy said cedar trees."

"Section 893.   How the Eight Preceding Sections Put in Force in Counties
and Magisterial Districts.—The eight preceding sections shall not be in force
in any county or in any magisterial district of any county until the board
of supervisors thereof shall by a recorded vote accept and adopt the same
for their county or magisterial district in their county, and such acceptance
and adoption shall not make the same operative unless the circuit court
of such county by an order duly entered shall ratify and approve the action
of the board.

"In the event the board of supervisors of the county neglect or refuse
to accept and adopt the same for their county, or for any magisterial dis-
trict of their county, then the majority of the qualified voters of said county,
or any magisterial district of said county, may request its adoption by
petition addressed to the circuit court of said county, and when it appears
from said petition that a majority of the qualified voters of said county,
or any magisterial district of said county, request the adoption of said
sections, then the said court shall declare the same adopted for such county,
or for any magisterial district in such county, requesting their adoption."

Valley and Piedmont sections, and it is said that the Valley alone had a normal annual production of about a million and quarter barrels. These orchards, while especially valuable to the owners, furnish employment to a large number of laborers, and others.

It appears from the testimony that the cedars in question are within one mile of several orchards. Other facts will appear from the discussion which follows:

[1, 2] The constitutional validity of this statute was assailed in *Bowman* v. *State Entomologist*, 128 Va. 351, 105 S. E. 141, 12 A. L. R. 1136. In a very lucid and exhaustive opinion by the late Judge Sims, every objection raised to the statute was satisfactorily answered, and the statute was upheld and enforced. The same objections and some others have been raised in the instant case. So far as the facts of the two cases are the same, the *Bowman Case* stands until reversed. All objections to the constitutionality of the statute are concluded by the *Bowman Case*, whether brought to the attention of the court in that case or not. This must be so of necessity, for if a statute is unconstitutional for any reason, it is a void statute, and "whenever a statute is enforced by a judgment or decree of a court, it is a judicial determination that the statute is a valid enactment and is free from all constitutional objections. If unconstitutional for any reason, whether assigned or not, the statute is void." *Portsmouth* v. *Weiss* (June, 1926), 142 Va. 94, 133 S. E. 781. We must, therefore, regard the assignments of error on constitutional grounds as an application to the court to reconsider its holding in the *Bowman Case*. This we have done most carefully, but see no reason for changing the conclusion reached in that case. Our views and the reasons therefor are so fully set out in the opinion in that case that we deem it unnecessary to do

more than to refer to the opinion and say that we adhere to it. The constitutional validity of the statute has also been upheld in *Kelleher* v. *Schoene*, 14 Fed. (2d) 341, by the United States District Court for the western District of Virginia.

In the petition for the writ of error in the instant case, the assignments of error are summarized as follows:

"1. The failure of the trial court to hold that the provisions of said statute are invalid, because in conflict with the first clause of the fourteenth amendment of the Constitution of the United States, in that by an enforcement of said statute petitioners' property will be taken without due process of law.

"2. The failure of the trial court to hold said statute invalid, as opposed to said clause of said amendment, because its enforcement will deny to petitioners the equal protection of the laws; and will contravene the principle inhering in government, forbidding the taking or destroying of private property, not for public use, but for the promotion of the *welfare* of *individuals.*

"3. The failure of the trial court to hold that said statute is invalid because of vagueness and indefiniteness.

"4. The failure of the trial court to hold that said statute, because of the provision thereof whereby it is to become operative as to any particular locality, by virtue of the action of ten or more freeholders, is void, because in conflict with said provision of the fourteenth amendment of the Federal Constitution guaranteeing to all citizens the equal protection of the laws, and inhibiting the taking, or destruction of property without due process of law.

"5. In holding that there is in force in Lee magisterial district of Shenandoah county, any law requiring the destruction of any cedar trees.

"6. In holding that, even if the said statute is in force in said county and district, that all of the red cedar trees on petitioners' land are subject to destruction, whereas, in any event no red cedar trees other than such as are or may be source, harbor, or host plants of cedar rust are included in the denunciation of the statute.

"7. In rejecting the evidence tendered by petitioners tending to prove that by reason of the destruction of said cedar trees (if the same be destroyed), petitioners will sustain damage to the extent of from five to seven thousand dollars because of the consequent diminution of the market value of petitioners' land.

"8. In holding that the statute does not require that compensation shall be made to petitioners for any diminution in the market value of their land resulting from such destruction of the cedar trees thereon; or, if the statute does not provide for such compensation, in holding that the same is not void as in contravention of said first clause of the fourteenth amendment of the Constitution of the United States."

Assignments of error 1, 2, 4 and 8, involving the constitutional questions aforesaid, are fully covered by the decision in the *Bowman Case*, and are overruled.

[3] It is said in the petition for the writ of error that the statute offends the equal protection clause of the Federal Constitution in that it cannot be put into operation except upon the initiative of ten freeholders, and that the court's attention was not called to this feature of unconstitutionality, nor was the case of *Eubank* v. *City of Richmond*, 266 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cas. 1914B, 192, referred to in that connection in the *Bowman Case*. As we have just pointed out, this is wholly immaterial. The statute is the same now in this re-

spect as it was when the *Bowman Case* was decided. But even if our attention had been drawn to the present argument, our conclusion would have been. the same.    The same point was made in the *Kelleher Case, supra,* and we so fully approve the opinion of the court on that subject that we cannot do better than quote what is there said:

"It is contended that the statute is void because of the provision (section 886) in respect to the written request of ten freeholders to the Entomologist.    Without so deciding, it may be assumed that counsel for plaintiff are right in saying that such a request is an absolute prerequisite to a notice from the Entomologist to the landowners to destroy any cedar tree.    However, it does not seem to us to follow that the statute either denies due process of law or the equal protection of the laws.    The freeholders are not given any power themselves to order the destruction of cedar trees, nor can they control the Entomologist in the performance of his duties, or the circuit court of the county in the exercise of its functions.

[4] "The power given is only that of putting the Entomologist under the duty of making or having made an examination.    The difference between this power and a power to condemn, or power to require the entomologist to condemn, is most obvious.    Hence, we cannot concur in the conclusion of counsel for the plaintiff that the plaintiff's rights are determined by irresponsible individuals.    So long as a request is not signed by ten freeholders, the owner of cedar trees remains undisturbed.    And the signing of a request does not determine anything except that at least ten freeholders desire that an official search for infected cedar trees be made in some designated territory.    The provision in question tends to protect the owners of

cedar trees from possible official overzealousness, as well as the orchardist from the ultimate payment of damages and expenses incurred by the possibly unnecessary destruction of cedar trees. While the provision seems to us wise and beneficent, it is at least harmless in respect to the owners of cedar trees. If it had been omitted, the remainder of the statute being as it is, infected cedar trees, within two miles of an orchard, in a district which has duly adopted the law, would be quite liable to destruction as they are now. And, if the statute without the provision as to the written request would be constitutional, we are entirely unable to see why the provision in question makes the statute unconstitutional.

"This statute differs so widely from the ordinance involved in *Eubank* v. *Richmond*, 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cas. 1914B, 192, and from the statutes in the other cases cited by counsel for plaintiff, that we think it profitless to discuss those cases."

The request of the freeholder simply inaugurates a preliminary investigation which, at the instance of the owner of the cedar trees, will result in a judicial trial wherein both sides are allowed to introduce all legal evidence and the court is "authorized to pass upon all questions involved." This is not a denial of due process, or the equal protection of the law. After the freeholders have made the request in writing they have nothing further to do with the case. The procedure is similar to, and may have been suggested by, the procedure under section 1520 of the Code, where, upon the complaint of five or more citizens of a public nuisance, the court is required to summon a special grand jury to specially *investigate* such complaint. *Jeremy Imp. Co.* v. *Commonwealth*, 106 Va. 482, 56 S. E. 224,

arose under this statute, and the court assumed, rather than decided, the validity of the statute.    The objection to the ruling of the trial court overruling à demurrer to the presentment was waived.

[5] Assignment of error No. 3 is: "The failure of the trial court to hold that said statute is invalid because of vagueness and indefiniteness."    This assignment is based on the use of the word "locality" in section 886 of the Code hereinbefore quoted.    Aside from the fact that this assignment is concluded by the *Bowman Case,* we do not think there is any doubt or uncertainty about the use of the word "locality" in that section. The statute is to be read as a whole, and when so read it is fairly plain that what was to be investigated was the existence of infected red cedar trees within two miles of an apple orchard, and the entomologist is required "to give notice in writing to the owner or owners of said cedar tree or trees to destroy the same," and that such notice should "contain a brief statement of the fact found to exist whereby it is deemed necessary or proper to destroy said cedar trees and call his attention to the law under which it is proposed to destroy said cedar trees."    The location of the cedars and their distance from an apple orchard or orchards is the subject of investigation, and this is the "locality" referred to in the statute.    No rights of any one except the owners of the orchards and the cedar trees are involved and those are measured by the statute.

This question was considered by the District Court of the United States for the Western District of Virginia, three judges sitting, in *Kelleher* v. *Schoene, supra,* where it is said:

"It is further contended that the indefiniteness of the word 'locality,' as used in respect to the written request to the entomologist, invalidates the statute.

A reasonable construction of the statute as a whole (see section 893) requires that the signers of any request to the entomologist must own estates of freehold in the county, or district, as the case may be, which has adopted the law, and in which are both the orchard or orchards to be protected and the cedar trees to be examined. While the expression (section 886), 'the locality from which said request is received,' is not a happy one, it means merely the locality to which the request relates, and does not mean that the freeholders who sign must reside in, or must own estates lying in, any particular 'locality.' If this is, as we believe, a proper reading of the statute, there is no necessary indefiniteness in the statute, nor does it authorize a request which is in any respect indefinite. The request need not relate to a 'locality' or to any undescribed territory. It can, and should, describe with all necessary accuracy and certainty, either the land to be examined, or the orchard or orchards, within a radius of two miles from which is the land to be examined, and a notice which does not thus reasonably specify the land to be examined could legally be disregarded by the entomologist, or could be successfully attacked by the owner of cedar trees on appeal to the circuit court. As there is no uncertainty of meaning as to who are freeholders of Ashby district, and as the statute does not authorize a request which leaves uncertain the territory to be examined, we think it unnecessary to further discuss this objection to the statute."

The case of *Connally* v. *Gen. Constr. Co.* (January 4, 1926), 269 U. S. 385, 46 Sup. Ct. 126, 70 L. Ed. 322, relied on by the plaintiffs in error, is not applicable to the facts in the instant case.

[6] It is assigned as error that the trial court erred "in holding that there is in force in Lee magisterial

district of Shenandoah county any law requiring the destruction of any cedar trees.''

The original act was approved March 4, 1914. Section one of this act (Code, section 883) declared infected cedars within *one* mile of an apple orchard to be a ''public nuisance.'' Section two of the act (Code, section 886) provided for the destruction of such cedars within *two* miles of an apple orchard. This statute was adopted by the supervisors of Shenandoah county, with the approval of the circuit court of the county, for Lee magisterial district, in said county, on June 14, 1920. Afterwards, on June 18, 1920, an act approved March 16, 1920 (Acts 1920, page 370), went into effect. The last mentioned act amended section 885 of the Code, which was section one of the original act, by striking out the word ''one'' and substituting therefor the word ''two,'' so as to declare a public nuisance infected cedar trees within *two miles* of an apple orchard. The statute contained no repealing clause, and did not alter or amend any other section of the act, as contained in Code, sections 883 to 893, both inclusive. No action was taken by the supervisors after amendment.

It is argued that the amendment operated as a repeal of the original act, and as the amendment had not been adopted, there was no cedar rust act in force in that district.

Why one mile should have been inserted in the first section of the act (Code, section 885) and *two miles* in the second section (Code, section 886) is a mere matter of conjecture, with which, in our view of the case, it is unnecessary for us to deal. The subject is discussed in *Kelleher* v. *Schoene, supra.* It may be observed, however, in passing, that the first section (Code, section 885) appears to be a mere declaration of public policy, declaring the infected cedars within *one mile* to be

*per se* a public nuisance, and might have been omitted, without impairing the completeness and efficiency of the residue of the act.

Whether or not it was necessary for the supervisors to readopt the law after the amendment is also a question we need not answer, as the Hottel apple orchard and also "four or five small blocks of trees are within a mile of these cedars." Another witness testified on this subject as follows:

"Q. Now, are there any other small orchards in the vicinity of that property?

"A. Oh, yes. We did not measure from any other orchard, but there are four or five orchards that we could see from this ridge—small orchards.

"Q. Are they within a mile of these cedars?

"A. Yes, sir; some are within a mile."

There was no evidence to the contrary.

So that, the supervisors having adopted the statute containing the one mile limit in the first section (Code, section 885), and there being orchards within the one mile limit, our enquiry is limited to the effect, if any, of the adoption of the amendment.

[7, 8] The object of judicial interpretation of a statute is to ascertain the intention of the legislature, express or implied, as the intent is the vital part of the statute. It is also to be borne in mind that repeals by implication are not favored.

[9] An amendment of a statute operates a repeal of its provisions to the extent, and only to the extent, that they are changed by or are repugnant to, the amendatory act. 25 R. C. L. 923, section 173.

[10] In the instant case, as above stated, the only change made was the substitution of the word "two" for the word "one" in section 885 of the Code. The remaining sections on the subject were left unchanged.

This did not in any way affect or change what had al
ready been done under the original act, but simply ex
tended the area within which thereafter infected cedars
should be deemed, *per se*, a public nuisance.    There is
no intimation of any other intention.

Counsel for the plaintiffs in error rely upon two Texas
cases to support their contention.

In *Ex Parte Jank*, 93 Tex. Cr. R. 88, 245 S. W. 685,
a "tick eradication" statute containing a local option
clause was approved by a vote of the people in 1919.
This statute was held "defective in various particulars;
and in 1920   *   *   *   the said law was so amended as
to correct the defects mentioned."    No vote was taken
after the amendment, and Jank was convicted under
the amended statute.    The court held that Jank "could
not be legally convicted under the law as it was when
adopted by Lee county at the local option election in
1919, because said law was fatally defective as held in
the *Leslie Case*; and that he could not be prosecuted for
acts committed subsequent to the adoption of the 1920
amendment to the statutes above referred to, because
the law then had not been put in effect in said county
by a new local option election."    In other words, what
had been adopted was a nullity, and what was valid
had not been adopted.

In *Ex Parte Ash*, 99 Tex. Cr. R. 272, 269 S. W. 435,
a no-fence law against horses, cattle, etc., containing a
local option provision, was adopted by a vote of the
people for Comanche county in 1903.    The only penal-
ties provided by the statute were damages, fees for im-
pounding, etc., but no fine.    In 1907 a statute was
adopted relating to horses, cattle, etc., providing "a
punishment for a violation of its provision in the shape
of a fine."    Laws 1907, Tex. C. 57.    Ash was prose-
cuted under the latter statute and fined $25.00.    The

court held: "The stock laws relating to horses, cattle, etc., as they were upon our statute books in 1903, when this local option election was held in the precinct under consideration, did not contain any provision punishing those who violated the terms of the law. Neither the relator nor those in his precinct have ever agreed by their vote to submit themselves to a law having such a penal provision in it. Of course, they might have voted such a law into effect, but the question is that they did not. Since they did not, we are constrained to follow the path so well outlined by our predecessors and to hold that the relator cannot be prosecuted under the penal provisions which were not in the law at the time it was adopted in said precinct."

The facts of the instant case are so entirely different that they render the cases cited inapplicable. As there are several orchards within a mile of the infected cedars there is no occasion to resort to the amendment extending the limit to two miles. We do not mean to intimate, however, that we would not enforce the amendment if the orchards were beyond the one mile, but within the two miles, limit. It is simply not necessary to decide that question. See discussions of this question in the *Kelleher Case.*

[11] It is assigned as error that the trial court erred: "In holding that, even if such statute is in force in said county and district, that all of the red cedar trees on petitioners' land are subject to destruction, whereas, in any event, no red cedar trees other than such as are or may be sources, harbor or host plants of cedar rust are included in the denunciation of the statute."

The testimony shows that all red cedar trees in proximity to apple trees *may be* the source, harbor or host plants of cedar rust. It is not necessary to wait for absolute infection before the cedars may be destroyed.

Such a construction would nullify the words "may be" contained in the statute.    The propagation and spread of "cedar rust" is well described in *Kelleher* v. *Schoene, supra,* as follows:

"Red cedar trees and apple trees of the best commercial varieties are particularly well adapted to the propagation of this disease.    The balls which grow on the infected red cedar tree produce in the spring millions of spores, which, when carried by the wind to any one of many most valuable varieties of apple trees, cause the cedar rust on the fruit and especially on the leaves of the apple tree. . This rust produces another spore while on the apple tree.    The latter spore, if carried by the wind to an uninfected red cedar tree, infects it, and causes a production on the cedar tree of the cedar balls, which make the first-mentioned spores.    The weight of the evidence clearly is that infected cedar trees within two miles of an apple orchard are from the first injurious, and in a few years are fatal, to the orchard.    It also appears that, unless the cedar balls be removed in the early spring of each year from the infected cedar trees, there is no remedy for the cedar rust disease except the destruction of the infected cedar trees.    Moreover, an infected cedar tree is not merely dangerous to apple trees within two miles of such cedar tree.    If the infected cedar tree infects an orchard, this orchard will infect previously uninfected cedar trees, and thus this dangerous disease is widely disseminated."

See also *Bowman* v. *State Entomologist,* 126 Va. 351, 369-70, 105 S. E. 141, 12 A. L. R. 1121.

This assignment of error is not well taken.

Assignments of error 7 and 8 may be considered together.    They are as follows:

[12; 13] "7. In rejecting the evidence tendered by petitioners tending to prove that by reason of the de-

struction of said cedar trees (if the same be destroyed), petitioners will sustain damage to the extent of from five to seven thousand dollars because of the consequent diminution of the market value of petitioners' land;

"8. In holding that the statute does not require that compensation shall be made to petitioners for any diminution in the market value of their land resulting from such destruction of the cedar trees thereon; or, if the statute does not provide for such compensation, in holding that the same is not void as in contravention of said first clause of the fourteenth amendment of the Constitution of the United States."

So far as the eighth assignment deals with the constitution at question therein mentioned, it is controlled by the *Bowman Case*.    One of the plaintiffs testified that he considered the trees bordering the drive to his house as ornamental, and that they had a "special value from a scenic standpoint," and it was this value they were seeking to prove in asking the witnesses the value of the farm, with and without the cedars.

[14] The statute, so far as it relates to damages, is not clear, and we are to gather the intention of the legislature as best we can from a consideration of it as a whole.    Section 885 of the Code denounces the prohibitory cedars within the territory designated as "a public nuisance."    It is made unlawful to even own them, and the owner is required to destroy them.    If he does so, no provision is made for compensation. Section 886 contains a similar provision requiring the owner to destroy the trees on notice from the State Entomologist, and no provision is made for the ascertainment or payment of the resulting damages, if any. Section 887 provides for the treatment of diseased cedars under the direction of the State Entomologist,

and the failure to obey his objection is made a misdemeanor, but still nothing is said about compensation for the expense entailed.    Section 889 directs the trees to be cut down by the State Entomologist, if the owner fails to do so, and provision is made for the payment of the "expenses thereof," but no provision is made for the payment to the owner of any compensation.    It is only when provision is made for an appeal to the circuit court that anything is said about damages, and even then the language of the statute* seems to intimate that it is doubtful if any damage will be incurred. It is not usual to pay the owner or occupant of land to abate a nuisance on his land, although within legislative power, and it must be presumed that the legislature knew the insignificant value of such cedars as are indigenous to the soil of the Valley.    It realized, however, that some damage might be sustained or incurred by the owner by interruption of his farming operations, by dragging or hauling the cedars over the sod, or land in cultivation, by the burning of the brush, by the trimming of the cedars for posts or firewood, by his personal supervision of the work in order to protect his farm from undue injury, or in selecting trees to be trimmed

---

*"*Section 891.    Appeal from Order of State Entomologist; Damages Paid by County Treasurer.*—Any owner finding objection to the order of the State Entomologist in requiring him to destroy his cedar tree or trees may appeal from said order to the circuit court of the county in which said trees are located, but said appeal must be taken within fifteen days from the date upon which the notice to destroy the same is served upon him.    Notice in writing of said appeal must be filed with the clerk of said court who shall forthwith transmit a copy thereof to the State Entomologist.    The filing of said notice shall act as a stay of the proceedings of the State Entomologist until it is heard and decided.    The court in regular or special session shall thereupon hear the objections, and is hereby authorized to pass upon all questions involved, and determine the amount of damages, if any, which will be incurred by the owner in case said trees are destroyed, and the costs incurred or to be incurred in cutting down trees under section eight hundred and eighty-six.    If the court should find any damages or such expense sustained, he shall order the amount so ascertained to be paid to the owner by the treasurer of the county out of the general fund of said county, and such order shall be entered by the clerk in the law order book of the said court."

and cut the proper length for posts or firewood, and some expense would be incurred if he did the cutting himself, or had it done. No doubt the legislature deemed such outlays as proper damages and expenses to be paid to the owner, if the circuit court deemed them proper. The State was not taking or damaging the property of the owner for either a public or a private use. It was simply abating a nuisance, and requiring the owner to so use his property as not to injure another. While under no obligation to do so, the legislature seems to have been willing to pay such incidental damages and expenses as we have indicated, to make the owner whole in this respect, and the statute so provided. But we find no indication in the statute of an intent to pay for scenic value. Section 887 makes provision for the preservation of cedar trees that are "ornamental trees in dooryards, grave yards, cemeteries and parks," *if practical.* These would be few and by careful attention might be treated and preserved in deference to sentiment, but it made no provision for the payment for scenic value of a double row of two hundred infected trees bordering a driveway from the owner's house to the highway, nor for the "several thousands" small cedars scattered over the farm. The views of the trial court as to the damages to be allowed the owner are thus expressed in the final order made in this case:

"The court in determining the amount of damages which will be incurred by the defendants in case the cedar trees are destroyed, did not determine the amount according to the doctrines applicable to the taking of land under the statutes of eminent domain, but followed the rules of decision beginning with the judgment of the late Judge Turner in the case of *Virginia State Entomologist* v. *Glass,* decided in the circuit court of the

county of Frederick in the year ————, and of a very large number of cases decided by this court, including the case of *Virginia State Entomologist* v. *Bowman,* (128 Va. 351, 105 S. E. 141) from which an appeal was taken to the Supreme Court of Appeals of Virginia, and *Virginia State Entomologist* v. *Funkhouser,* and same against *Filtzmoyer,* from which last two decisions an appeal was ineffectually sought. This court, in construing the act, and especially sections 885, 886, 887 and 891, is of the opinion that the damages in contemplation of the act are such damages to the land only as would be incurred by the defendants incident to and resultant from the cutting of the cedars, including reasonable compensation to the cedar trees for supervision while the work of cutting and destroying the cedars was being done, and that it was not in contemplation of the act that the cedar tree owner, in case his cedars were a public nuisance, should be compensated in face of his refusal to obey the order of the Entomologist, on the basis of recovery for taking or damaging property under the statutes of eminent domain.

"But the court is of the opinion that the legislature only contemplated by this act that the county and ultimately the orchardists should pay the costs of destroying the trees, and the actual damage done the premises from which the cedars are removed by the work necessary to be done to destroy the trees and clear off the land, the owner to get the trees and wood for his own use, this damage to include compensation for injuring the sod and for interrupting and interfering with the use and enjoyment of the land, and any resultant injury due to the acts of cutting and destruction of the said cedar trees."

In the case of land taken or damaged for a public use, the legislature has been very careful to provide the most

ample protection for the landowner at every stage of the proceeding, and to declare in detail what these proceedings shall be. Code, chapter 176. But there is nothing of that kind in the statute under consideration, and no indication that similar damages should be allowed. If it had been intended that similar damages should be allowed, it would seem that the legislature would have required a proceeding under chapter 176, where all the machinery was provided, and the details of the procedure prescribed. We approve the holding of the trial court on the subject of damages to be allowed to the owners of the cedar trees.

We find no error in the judgment of the trial court, and it is accordingly affirmed.

*Affirmed.*

CAMPBELL, J., dissenting:

I am unable to concur in the conclusion reached as to the damages awarded.