# Richmond

## G. Louis Stickley v. H. C. Givens, State Veterinarian.

November 25, 1940.

Record No. 2328.

Present, Campbell, C. J., and Holt, Hudgins, Gregory,
Eggleston and Spratley, JJ.

The opinion states the case.

*Richard S. Wright, Jr.,* for the appellant.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

We are here called upon to determine the validity of the Act approved April 1, 1938, sometimes called the Bang's Disease Act (Acts of the General Assembly of Virginia, 1938, chapter 439, page 984, *et seq.*), providing for the prevention, control and eradication of contagious and infectious diseases of livestock and poultry. Virginia Code 1936, sections 907-920, as amended.

G. Louis Stickley, a dairyman, residing in Shenandoah county, Virginia, in June, 1939, brought this suit against H. C. Givens, State Veterinarian, to enjoin the enforcement of the provisions of the above statute.

The material allegations of the bill were that the State Veterinarian, on August 9, 1938, after due notice, tested 139 of Stickley's cattle for Bang's disease, by the agglutination method; that the tests were conducted in an improper and insanitary manner over the protest of the plaintiff; that, as a result of the test, 45 were alleged to be found infected with Bang's disease and 32 of them so branded and marked; that, on subsequent visits of the State Veterinarian, he was not permitted to make further tests upon such of the plaintiff's cattle as did not appear to be infected on August 2nd; that after the vaccination of the cattle by the plaintiff in March, 1939, the agglutination test was ineffective for at least a year; that nevertheless the plaintiff believed that the State Veterinarian intended to again test such of his cattle as were suspected of having the disease and to seize and slaughter such as he found to be infected with it; that certain authorities were of the opinion that vaccination and strict quarantine were better methods for controlling the disease than the method prescribed by the statute and that the latter method did not produce conclusive and definite results; that no appraisal was made of the branded cattle nor compensation tendered therefor; that the statute provided no right of appeal from the findings of the State Veterinarian as to the existence of the disease in the cows tested nor any judicial inquiry as to the value placed by the appraisers upon cattle condemned as infected; and charged that the statute under which the tests were made was in violation of the provisions of the first clause of the Fourteenth Amendment to the Constitution of the United States and of section eleven of Article I of the Constitution of Virginia, in that it deprived the plaintiff of his property without due process of law and denied to him the equal protection of the laws.

The bill did not deny that the cattle were infected with Bang's disease nor did it allege that the presence of the disease did not create a public nuisance.

A temporary injunction was granted, effective to July 10, 1939, restraining the State Veterinarian from slaughter-

ing or interfering with the cattle of the plaintiff. On July 1st, next, the State Veterinarian, hereinafter referred to as the defendant, filed his demurrer to the bill. Upon a hearing on the bill and the demurrer, on July 10th, the trial court sustained the demurrer in its entirety. On August 1, 1939, the defendant was again restrained from the condemnation and slaughtering of the diseased cattle until May 1, 1940, upon a stipulation that the vaccination of the cattle on March 31, 1939, by the plaintiff, would render a subsequent agglutination test ineffective for a period of twelve months from the date of such vaccination. By leave of court, the plaintiff amended the second paragraph of his original bill, the new paragraph setting out allegations of an improper and insanitary manner of conducting the tests complained of and the injury resulting therefrom. The defendant demurred to the amended bill and filed his answer denying that the tests were improperly conducted.

On September 2, 1939, another decree restrained the plaintiff from taking any evidence, except upon the issues raised in the second paragraph of his bill, and again sustained the demurrer to the original and amended bills.

On April 26, 1940, the trial court held that the evidence submitted did not support the averments of paragraph two of the amended bill of complaint, and entered a decree dismissing the bill at the cost of the plaintiff.

The evidence, so far as is pertinent to our inquiry, is as follows:

In August, 1938, the State Veterinarian, with the consent of Stickley, proceeded, in accordance with the statute, to make an agglutination test of the cattle for Bang's disease. This test consists of a laboratory examination of the blood of the animal to discover the presence of the disease. The blood is withdrawn from the jugular vein of the animal and immediately forwarded to the laboratories of the Virginia Department of Agriculture and Immigration for testing. Upon this test, 45 cows were found to be infected. The owner was notified, and the cattle branded and marked

for the purpose of immediate quarantine and subsequent destruction.

Stickley became dissatisfied with the results of the test and refused to permit the State Veterinarian to return to make a further test upon other of his cattle suspected of being infected with the disease. While the Veterinarian was continuing his efforts to make the further test, Stickley had his cattle vaccinated with virus vaccine. The result of such a vaccination made it impossible to make an effective agglutination test for a period of at least one year after the date of vaccination. The subsequent tests contemplated by the Veterinarian were not conducted because of the objection of the plaintiff and the institution of this proceeding.

Without setting out the detailed evidence of the method of testing employed by the State Veterinarian, it is sufficient to say that, while the evidence is somewhat in conflict, there is ample evidence to show that the tests were conducted in an approved sanitary manner, and that they disclosed the presence of Bang's disease in the cattle so marked and branded and a reasonable cause to suspect its presence in the animals sought to be subjected to further tests.

We agree with the finding of the trial court, on the question of fact, that the weight of the evidence did not support the allegations of the second paragraph of the bill.

The Act of April 1, 1938, was enacted in consequence of a nation-wide program to eradicate tuberculosis, Bang's disease and other contagious and infectious diseases among domestic animals and poultry. It gave to the State Board of Agriculture and Immigration, the State Veterinarian and all other veterinarians within the State authority, and made it their duty to use their best efforts to protect domestic animals from such diseases. It declared that, "The diseases known as tuberculosis, foot and mouth disease, anthrax, Bang's abortion disease, * * * shall be classed as contagious and infectious diseases of livestock and poultry,

and such measures shall be taken by the board (the State Board of Agriculture and Immigration) or its authorized veterinarian as to them may seem necessary, to eradicate and prevent the spread of the said diseases." It required the State Veterinarian, upon receipt of information of the existence of any infectious or contagious disease among domestic animals, to go at once and make an examination of the animals, and, if he found them to be infected, to adopt and enforce such quarantine and regulations as might be deemed necessary to prevent the spread of the disease. It provided a special test for Bang's disease, the agglutination test, and for the condemnation, quarantine and slaughter of cattle found infected with that disease. It allowed the owner of the diseased cattle to sell or slaughter them under State or Federal supervision, to dispose of the carcasses under rules and regulations of the State Board or State Veterinarian, and to retain the proceeds. In the event the owner did not slaughter an infected animal within a specified period of ninety days, the State Veterinarian was authorized to seize the condemned animal and slaughter it. A further provision was made for the appraisal of the fair cash value of the condemned animal by a board of arbitration, and for payment of such value, to an ascertained limit, from the Federal and State appropriations provided therefor.

The principal question for our consideration is whether the challenged Act constitutes a reasonable exercise of the police power of the State. If it is a reasonable exercise of such power, it is constitutional.

Many cases have come before the courts involving statutes for the protection of the public health and for the prevention of the spread of disease among animals and plants. The validity of these statutes authorizing the destruction of cattle and trees, having infectious or contagious diseases, have often been sustained as an exercise of the police power. *Durand et al.* v. *Dyson et al.*, 271 Ill. 382, 111 N. E. 143, Ann. Cas. 1917D, 84; *Campoamor* v. *State Livestock Sanitary Board*, 136 Fla. 451, 182 So. 277; *Miller* v. *Schoene*,

*State Entomologist,* 276 U. S. 272, 48 S. Ct. 246, 72 L. Ed. 568; *Id.,* 146 Va. 175, 135 S. E. 813, 67 A. L. R. 197; *Lawton* v. *Steele,* 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385; *Bowman* v. *Virginia State Entomologist,* 128 Va. 351, 105 S. E. 141, 12 A. L. R. 1121; also see 8 A. L. R. 69; 43 L. R. A., (N. S.), 1076; *Lowe* v. *Conroy,* 120 Wis. 151, 97 N. W. 942, 66 L. R. A. 907, 909, 102 Am. St. Rep. 983, 1 Ann. Cas. 341; 2 Am. Jur. 810; 3 C. J. S., Animals, section 55, p. 1167.

Animal husbandry is a vital and important factor in the State and national economy. It is in the public interest that healthy cattle be produced and kept free from disease, and that animal products, such as milk from healthy cows, be secured in abundance. The appearance of infectious and contagious diseases in cattle is in its nature a menace to the public health.

It is not necessary that the condition directed to be remedied should have been a nuisance at common law and abatable as such. The menace is no less a nuisance because of the later discovery of its danger or the earlier failure to so denominate it. If it produces a condition affecting injuriously the public interest, it is within the province of the legislature to cause its abatement. That, in fact, it is and has the effect of a public nuisance is sufficient to authorize the exercise of the police power. Where consideration of social policy requires the reasonable exercise of that power, its exercise is not in violation of due process of law.

The police power of a State is the right of the State to safeguard and protect the public safety, health, morals and general welfare of its people. Much has been said and written concerning the extent and limit of this power. It is too broad and comprehensive to be defined within fixed limits. It is not limited merely to dealing with what constitutes nuisances at common law. The welfare of society and the constantly changing conditions of life more nearly determine its limitations. *Bowman* v. *Virginia State Entomologist, supra; Reynolds* v. *Milk Commission,* 163 Va. 957, 179 S. E. 507; *Highland Farms Dairy, Inc.* v. *Agnew,* 300 U. S. 608, 57 S. Ct. 549, 81 L. Ed. 835; *Nebbia*

v. *New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, and cases cited.

It must be presumed that the General Assembly of Virginia, in declaring the abatement of Bang's disease necessary for the protection of the animal industry, carefully investigated and considered the effect of the disease in lessening the reproduction and breeding of calves and in destroying the usefulness of the grown animals, and the ease with which the germs of the disease contaminated other cattle. Having arrived at a conclusion, it was its duty to enact measures for such protection. It was then within its discretion to provide a method or methods of control and eradication. That other methods might be used to detect the disease or prevent its spread is beyond the question. The existence of other methods in no wise lessens the binding force and effect of the method selected by the legislature, a method approved and supported by competent medical authority. It, therefore, bore a reasonable relation to a proper purpose. The exercise of the method adopted was not a delegation of legislative power but the exercise of administrative and ministerial functions by agents best qualified to understand the nature and condition of the case and to appreciate the necessity for the exercise of the conferred power. The courts may not determine the necessity for legislation nor the form of its exercise; but only whether legislation is a proper exercise of the power of the State. *Durand et al.* v. *Dyson et al., supra.*

The determination of the condition found by the prescribed test definitely fixes the condition of the tested animal as free from or infected with the disease sought to be eradicated.

Here the uncontradicted evidence shows the existence of the disease in the animals of the plaintiff. It is the fact of such disease which, under the statute, gives the power to the State Veterinarian to condemn the infected animal.

The trial court did not err in excluding evidence, save as to the manner in which the tests were conducted.

To allow evidence to be taken to prove that there are more effective methods for the control of Bang's disease than that selected by the legislature would nullify the statute and amount to an assumption by the court of the province of determining the propriety, wisdom and policy of the legislature. When the subject lies within the police power of the State, a debatable question of its reasonableness is for the legislature. We have no power nor authority to substitute, in our judgment, an alternative method for the method adopted by the legislature. 16 C. J. S., Constitutional Law, section 198, pages 567, 569.

In *Durand et al.* v. *Dyson et al.*, *supra*, where the main allegations were that a method which authorizes the killing of cattle afflicted with foot and mouth disease was unconstitutional and an unreasonable exercise of the police power of the State because the owner was required to accept an appraised value rather than the actual value, the court in construing an Illinois statute, much similar to the Virginia statute, held [271 Ill. 382, 111 N. E. 145, Ann. Cas. 1917D, 84]:

"Cattle afflicted with a dangerous and contagious disease are public nuisances as defined by the common law, and under the common law such a nuisance could not be legalized because it invaded the peace and safety of the people. * * * There are numerous other cases that recognize the power of a state to order the destruction of valuable property without compensation to the owner when it has become a public nuisance. * * *

" * * * This court is not able to say that the Legislature in this act has abused its discretion and that the measures it has adopted to prevent the spread of dangerous diseases among cattle are unnecessary and unreasonable. The investigation and determination of the question whether or not animals are afflicted with dangerously contagious and infectious diseases demand prompt action if the spread of the diseases is to be prevented, as well as the question whether or not the slaughter of the animals is necessary. To secure this prompt investigation and determination it is

necessary and customary to lodge these duties with a board or commission. * * * All the questions raised by appellants by the averments in their bill are therefore questions of fact to be settled by the Legislature and by the board of live stock commissioners, and not by a court of equity, when it is determined by the court that the act is not in contravention of any constitutional provision."

In *Bowman* v. *Virginia State Entomologist, supra,* and *Miller* v. *Schoene, State Entomologist, supra,* we upheld a statute providing for the eradication of a disease among cedar trees, by the destruction of the trees, as being a statute under the police power of the State. It is true that that statute declared the disease of cedar rust to be a public nuisance. It would, indeed, be a queer state of reasoning to hold that a disease of a tree is more dangerous to the public or more of a public nuisance than an infectious and contagious disease of an animal. The principle involved in the exercise of the police power is the same, and certainly the extent of the menace sought to be avoided in the case of diseased animals is greater than in that of diseased trees. After all, it is the duty of the courts to determine whether a public nuisance exists, in the absence of an express declaration of the legislature.

In this State the milk industry has been held subject to regulation in the public interest. In *Reynolds* v. *Milk Commission, supra* [163 Va. 957, 179 S. E. 511], Mr. Justice Gregory said:

"If laws passed have a reasonable relation to a proper purpose and are neither arbitrary nor discriminatory the requirements of due process are satisfied.

"Another general principle applicable here is that a State legislature deals with situations from a practical standpoint. It is better qualified than the courts to determine the necessity, character and degree of regulation of animals, which new and perplexing conditions may require; and its conclusions should not be disturbed by the courts unless they are clearly arbitrary and unreasonable."

Regulation of the sale of milk has also been upheld by the Supreme Court of the United States. In *Highland Farms Dairy, Inc.* v. *Agnew, supra,* it was held that the dairy statute had its relation to the public interest because of the demand of the public for milk. To a certain extent there the interest of the individual was affected; but the public interest was held to be superior.

In *Miller* v. *Schoene, State Entomologist, supra,* the Supreme Court of the United States affirmed this court in upholding the Virginia statute for the control and destruction of cedar trees infected by cedar rust as not being violative of due process of law. There Mr. Justice Stone said [276 U. S. 272, 48 S. Ct. 247, 72 L. Ed. 568]: "And where the public interest is involved preferment of that interest over the property interest of the individual is one of the distinguishing characteristics of every exercise of the police power which affects property." Citing cases.

 Having reached the conclusion that the Act of April 1, 1938, is a reasonable exercise of the police power of the State for the protection of the general public, it is unnecessary to consider the objection that it does not provide for full compensation to the owner of condemned cattle. In the abatement of a public nuisance, it is not necessary to provide any compensation to the owner of the property which creates the nuisance.

See Annotation, 67 A. L. R. page 208, on "Right to and measure of compensation for animals or trees destroyed to prevent spread of disease or infection."

Compensation allowed in the statute under review is allowed by the grace of the State. The provision extending the time within which the cattle may be disposed of is likewise a concession to the owner of the cattle in order to save him loss.

 In this case, the statute requires that notice be given to the owner of suspected animals that they will be tested. The test is made by a person designated by the statute and qualified to perform the work. The results of the test are determined from a medical or biological stand-

point rather than judicial. The conclusion, when arrived at by the approved method, establishes the existence or non-existence of the condition sought to be abated by the statute. The owner of an infected animal has no right to hold his property against the safety and welfare of the general public.

 Laws passed for the preferment of the public interest over the property interest of the individual, to the extent even of its destruction, have been consistently found to have been enacted in accordance with due process of law. It is only when the owner has been deprived of his property without due process of law, or where the provisions of the law have not been followed, that he is entitled to judicial review. When he is entitled to review, he is allowed that right whether it is embodied in the law or not.

 Of course, for fraud or for improperly following the provisions of the law, either in the method prescribed or otherwise, the owner of the condemned property has his remedy. The burden of proving such charges, however, is upon the owner. He is not denied a judicial inquiry in this respect, nor is he denied the right to test the validity of the law which he opposes, as exemplified by this proceeding.

 The abatement of a nuisance often requires prompt and summary proceedings, and where the abatement is authorized under the police power of the State and due process of law has been observed, the owner of the property destroyed for the public good has no constitutional rights beyond those provided in the statute under which the abatement is made.

In *Powell* v. *Pennsylvania*, 127 U. S. 678, 8 S. Ct. 992, 1257, 32 L. Ed. 253, the Supreme Court of the United States said that it was a settled doctrine that a statute, enacted in the legitimate exercise of the police power of the State, was not inconsistent with the Fourteenth Amendment of the Constitution of the United States.

 After a careful consideration of all the questions involved, we find no error in the rulings of the trial court. We are of opinion that the challenged Act is a reasonable

exercise of the police power of the State, and that it is not violative of the Constitution of the United States or of the Constitution of the State of Virginia. The final decree of the trial court is, therefore, affirmed.

*Affirmed.*