# Richmond

## R. J. REYNOLDS, ET ALS. V. MILK COMMISSION OF VIRGINIA.

March 29, 1935.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning, Chinn and Eggleston, JJ.

The opinion states the case.

*Timberlake & Nelson,* for the appellants.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the appellee.

GREGORY, J., delivered the opinion of the court.

The appellants were perpetually enjoined and restrained from distributing milk in the city of Staunton until they shall have received a license from the Milk Commission, and from selling milk in the Staunton-Waynesboro market area at any other price than that fixed by the Commission. They were also required to pay any and all assessments levied upon them under the authority of the Commission. It is of the decree carrying the injunction into effect that the appellants complain.

The pleadings in the case consist of the bill of complaint filed by the Milk Commission and the answer thereto filed by the appellants. The cause was heard upon an agreed statement of facts.

In the bill of complaint it was alleged that the complainant, the Milk Commission was created by the provisions of chapter 357, page 558, of the Acts of the General Assembly of 1934; that said act grants authority to the complainant to regulate and control the milk industry in Virginia, and to make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of the act; that the complainant was given power to define and create natural market areas within which milk shall be produced to supply such area; that the Commission may require all distributors to obtain a license and that licenses may be classified; that complying with the provisions of the act the Commission established the Staunton-Waynesboro market area, fixed the price of milk and adopted rules and regulations for the industry; that seventy-five per centum of the producers and distributors in that area were desirous of having the Commission exercise its power there; that previously, milk was being sold in Staunton at prices ranging from eight cents to twelve cents per quart; that all efforts to stabilize the price had failed because a few producers and distributors declared their purpose and intention to market milk below the cost of milk produced in compliance with the health laws of the State.

The Commission finds and alleges that milk is an essential item of diet; that the production and distribution thereof is a major industry and represents more than twenty-five per centum of all agricultural income of the State; that it is of greater value than the combined income from corn, wheat, tobacco and apples and that it represents an investment of many millions of dollars.

It is alleged "that the fluid milk production, sale and distribution is affected by many factors peculiar to itself and necessitates governmental control in order to insure an economical, profitable and healthful conduct of the business;

that milk is perishable, cannot be stored, and is a medium for the growth of bacteria and the transmission of diseases; that, under approved methods of distribution into larger markets, the industry must carry a surplus of approximately twenty per centum, as the demand and supply vary from day to day; that the adjustment of supply and demand is hindered by factors difficult to control, as surplus presents very difficult problems, as the price realizable is necessarily much less than that for milk sold for consumption in fluid form, and that the stabilization of prices requires that the burden of the loss in the marketing of surplus milk be shared equally by all producers and distributors in each market area; that, if this burden is not shared by all, a condition arises resulting in a demoralized situation on the market, leading in practically all instances to disastrous price cutting, and that this market condition may be and is brought about by small distributors carrying a much less surplus in proportion to that necessarily carried by the larger distributors.

"While complainant has not had the advantage of the findings of a commission of inquiry into the dairy business in Virginia, the Virginia State Dairymen's Association, began an extensive study of all of the numerous phases in connection with the production and distribution of milk in Virginia as early as May, 1933. These associations reached the conclusion, after a most extensive investigation, that milk and cream were sold in a large majority of cities at prices substantially below a reasonable cost of production of high-grade, healthful milk, and that many unfair trade practices made it impossible for producers to receive a fair price for their milk; that science has demonstrated that the unregulated production of milk and unrestricted prices of cost production of milk under exceedingly unsanitary conditions, and the distribution and sale without careful marketing precautions, and the consumption of all milk except that which is carefully and cleanly produced are exceedingly harmful to all classes of consumers and especially dangerous to the many infants who are principally reared upon

fluid milk and to children a large part of whose diet consists of milk.

"That the public have accepted the findings of science is best illustrated by the fact of common knowledge to all; that practically all cities and almost all incorporated towns have passed ordinances regulating the production and distribution of milk and requiring tests of all milch cows kept in dairy herds, and providing for the feeding of cows, the conditions and surroundings of barns, the kind, care and cleanliness of utensils, the cleanliness of the clothing, and for the periodical, personal inspection of persons concerned in milk production."

Complainant then alleges that Reynolds, Miller and Montgomery, the appellants here, are selling milk in Staunton without a license as is required by the act; that they are selling below the prices fixed by the Commission for that market; that they have declared their intention to continue to sell below the market price and they refuse to pay the assessments provided for in the act and rules promulgated thereunder. It is then alleged that the success of the purpose of the General Assembly will fail if they are permitted to continue to violate the regulations and the act.

The defendants filed their answer in the court below. They denied none of the allegations above set forth, but admitted that they were violating the act in that they were selling milk in Staunton without first securing a license; that they were not complying with the price regulation; and that they were selling below the prices fixed by the Commission.

They give as their reason for their admitted violation of the act that it is unconstitutional and void; that it contravenes section 1, article I, of the Constitution of Virginia; and that it contravenes the Fourteenth Amendment to the Constitution of the United States.

After hearing the cause upon the bill, answer and an agreed statement of facts the chancellor perpetuated an injunction, which had been previously awarded, restraining

the defendants from violating the act or the regulations, and in an able opinion gave his reasons for so doing.

In the main there are just two questions to be decided. Does the act contravene the Virginia Constitution? Does it contravene the Fourteenth Amendment of the Federal Constitution?

It is conceded that if the Virginia act is no broader than a somewhat similar act which was recently enacted by the legislature of New York, the decision of the Supreme Court in the case of *Nebbia* v. *People of State of New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, where the New York act was upheld as not violative of the Fourteenth Amendment, is binding here and decisive of that question. However, section 1, article I, of the Virginia Constitution is relied upon here as having been violated by the Virginia act. The challenged provisions of the Virginia and Federal Constitutions are quite similar. Both guarantee to the citizen certain inherent rights, and, in our opinion, if the act violates the Federal Constitution it also will violate the Virginia Constitution. On the other hand, if it does not offend the Federal Constitution, then it will not offend the Virginia Constitution.

On March 29, 1934, the General Assembly enacted as an emergency measure the act in question which provides for the supervision, regulation and control of the milk industry in Virginia (chapter 357, Acts 1934, page 558). The preamble to the act sets forth the legislative determination and declaration of certain facts. Briefly those facts are that the production and distribution of milk and cream is an industry upon which, to a substantial degree, the prosperity. and health of the Commonwealth depend; "and the present economic emergency is in part the result of the disparity between the prices of milk and cream and other commodities, which disparity has diminished the power of milk producers to purchase industrial products, has broken down the orderly production and marketing of milk and cream and has seriously impaired the agricultural assets supporting the credit structure of the Commonwealth and local political

subdivisions thereof;" that unfair, unhealthful, unjust, destructive and demoralizing trade practices exist and are carried on in the dairy industry which impair the industry and the constant supply of pure wholesome milk to the inhabitants of the State and constitute a menace to the health and welfare of the people.

To protect the well-being of the people of the State and to promote the public welfare, public health and public peace, the production, distribution and sale of milk is declared by the legislature to be a business affecting the public peace, health and welfare. It is then determined that the industry should be supervised and controlled in the exercise of the police power.

A Milk Commission is created and declared to be an instrumentality of the Commonwealth. Its powers are prescribed and defined. Among the powers of the Commission are the following: To investigate all matters pertaining to the production, processing, storage, transportation, distribution and sale of milk in the State; to supervise, regulate and control the production, transportation, processing, storage, distribution, delivery and sale of milk for consumption in the State; to act as arbiter in disputes, between the producers and distributors; to examine into the business, books and accounts of any producer or distributor, to issue subpoenas to the producers and distributors and require them to produce their records. The Commission is empowered to make, adopt and enforce all rules, regulations and orders necessary to carry out the purposes of the act. Provision is made for the service of the rules and orders of the Commission.

Before the Commission exercises its powers in any market area a public hearing is had and the Commission determines whether it will be to the public interest that its powers be exercised in that market. The Commission may withdraw from any market after a public hearing if the public interest demands it.

If a majority of the producers and distributors (measured by volume) of a market area apply to have the Com-

mission withdraw the exercise of its powers in that particular area, the act provides that the Commission must withdraw.

The act provides that the Commission, after public hearing and investigation may fix the prices to be paid producers and may fix the minimum and maximum wholesale and retail prices to be charged for milk in any market and it may fix different prices for different grades of milk. In determining the reasonableness of prices, the Commission shall be guided by the cost of production and distribution in the area, the necessary operation, processing, storage and delivery charges, the prices of other foods and the welfare of the general public.

A license may be required of producers and distributors, and the Commission may grant or decline a license or revoke one already granted, after due notice and a hearing. Any order of the Commission refusing or revoking a license, may be reviewed upon appeal to the Supreme Court of Appeals.

Natural market areas may be designated and defined and the limits of milksheds may be fixed. The Commission may delegate its powers to milk boards of certain market areas for the purpose of carrying out the act. Distributors may not buy milk from unlicensed producers and distributors must be licensed in order to distribute milk.

The Commission is required to prepare an annual budget and shall collect from the local boards sufficient sums in the form of monthly assessments which are to be paid to the State Treasurer and by him placed to the credit of an account known as "Milk Commission Account." From this account appropriation is made to take care of the expense of operation.

The act provides for the creation of local milk boards in market areas and defines their duties and powers to be such as are delegated to it by the Commission. The expenses for operation of the local boards and the assessments of the Commission are met by an assessment against producers and distributors based on the quantity of milk handled.

If the act is violated, in addition to any other remedy, the Commission may apply to any court of record in the city of Richmond for relief by injunction, if necessary, without being compelled to allege or prove that an adequate remedy at law does not exist. Section 13 provides a penalty for violations of the act and fixes the punishment. These are the outstanding features of the act.

The chancellor held that there were no substantial differences between the Virginia act and the New York act (Agriculture and Markets Act, N. Y. section 300 *et seq.*, as added by Laws 1933, chapter 158). In this we agree, for in applying the constitutional test the minor differences in phraseology need not be considered.

In considering the question of constitutionality there must be borne in mind certain fundamental principles. They were enumerated by the chancellor in this language:

"Outside the power ceded to the federal government, the power of the legislature of Virginia to enact statutes is without limit, except as restrained by the Constitution of Virginia.

"Courts ought not to pronounce any act of the legislature unconstitutional unless it is plainly so—so plain as to leave no doubt on the subject. To doubt is to affirm its constitutionality. There is no such thing as a doubtful constitutional statute. Every presumption is in its favor, and there is no stronger presumption known to the law.

"The particular form in which it is charged that this legislation is contrary to section 1 of article I is that it is an undue restraint and interference with the freedom of the individual to contract, and that the particular nature of this interference was the attempt to control prices and the area in which a given producer might sell or distribute his product.

"All constitutional restraint must be read in the light of the police power of the State. On proper occasions this power may rise superior to both State and Federal Constitutions, for in its exercise, when occasion demands lies the right of the State to preserve its very existence. As life,

liberty and pursuit of happiness are the inalienable rights of the individual of which he cannot by compact divest either himself or his posterity, so to the State is the police power an inalienable right of which it does not divest itself by any compact. Its scope is the protection of the health, safety and morals of the people, and their property. It is an indeterminate and indefinable power that inheres in all legislative agencies. This power has never been defined or circumscribed by fixed limits. Some have described it as the law of necessity and the power of self-preservation. It is elastic and expands automatically to protect the public, and extends to all great public needs."

It should also be borne in mind that an act is not to be construed as meaning that regulations promulgated under it will at some future time be exercised capriciously, arbitrarily or inequitably. It will be time enough to complain when, if ever, the power shall be thus abused.

Then too, another general principle applicable here is that a State legislature deals with situations from a practical standpoint. It is better qualified than the court to determine the necessity, character and degree of regulation of an industry, which new and perplexing conditions may require; and its conclusions should not be disturbed by the courts unless they are clearly arbitrary and unreasonable.

The legislative facts declared in the act are nowhere denied, nor are the facts alleged in the bill denied; therefore, those facts may be considered as definitely established. They conclusively show the imperative need for regulating the milk industry even to the extent of fixing prices, in order to prevent its serious impairment or destruction as well as to protect the public interest.

There are two outstanding cases holding that the State may control private business, even to the extent of fixing prices, when it is affected with a public interest or clothed with a public use, without violating the Federal Constitution. They are *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77, and *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189. Another

recent case makes a much broader application of the principle. In *Nebbia* v. *People of State of New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, it was held that a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose; that the courts are without authority to declare such policy or when it is declared by the legislative arm, to override it. If the laws passed have a reasonable relation to a proper purpose and are neither arbitrary nor discriminatory the requirements of due process are satisfied.

These three cases are illustrative of the tendency of the Supreme Court to extend the principle rather than to limit it. A great many cases involving State control over private business have reached the Supreme Court but it is not necessary to refer to them. The three cited above are sufficient authority to sustain the act challenged in this proceeding.

We are of the opinion that it is not necessary for this court to apply the principle in its broadest aspect, nor is it necessary to commit the court to the proposition that the State has not the power to control private business unless it is affected with a public interest. The application of the principle in the *Nebbia Case* goes farther than it is necessary for us to go in the case at bar.

In the *Munn Case, supra,* the Constitution of Illinois declared all elevators or warehouses, where grain or other property was stored for compensation, to be public warehouses. Later a law was enacted fixing the rates of storage. The law was sustained against the contention that it deprived the owners of their property without due process of law. In that case which was decided in 1877, the argument was made (just as it is made in the present case) that a decision upholding the law would be so sweeping and dangerous that it would comprehend and subject to legislative control all of the business and affairs of life and prices would be fixed by the State on all commodities. Mr. Justice Field in a vigorous dissent pointed out that the decision of the majority was subversive of the rights of private

property which theretofore had been believed to be protected by constitutional guarantees against legislative interference. He observed that if the opinion of the majority be sound law then there was no protection, either in the principles upon which our republican government is founded, or in the prohibitions of the Constitution, against the invasions of private property; that all property and all business in the State would be held at the mercy of the legislature. He said that the public had no greater interest in warehouses privately owned than it had in the homes of families; that the legislature could fix rental prices of residences and if the owner does not like the rates, he can cease renting his property. He concluded that such a doctrine had never been before asserted by any judicial tribunal in the United States. Again, the justice observed that if the legislature of a State, can determine against the consent of the owner the prices he shall receive for his property, it can thereby completely deprive him of his property. In other words, it can confiscate and destroy his property by virtue of its power to fix the prices he shall receive for it.

The earnest argument of learned counsel for the appellants here against the act in question is almost the identical argument used by Mr. Justice Field against the warehouse act in his dissenting opinion. But after considering the case for more than a year the Supreme Court upheld the warehouse act, in the face of the fact that Mr. Justice Field was of the opinion that it was subversive of the rights of private property and opened the door to price-fixing for every commodity and property privately owned.

In that case the court went no further than to hold that the State, under its police power, has the right to regulate a business which is affected with a public interest, or clothed with a public use. The *Munn Case* is a landmark. It is accepted as an authoritative and accurate statement of the principle on which the right to fix rates or prices is based.

Another landmark in the law was reached when the Supreme Court in 1914 held that fire insurance rates might

be fixed by the rate-making body of a State, and that this would not be a prohibited invasion of private rights or do violence to the Constitution. *German Alliance Insurance Co.* v. *Lewis,* 233 U. S. 389, 34 S. Ct. 612, 618, 58 L. Ed. 1011, L. R. A. 1915C, 1189. An act of Kansas was before the court in which the State had undertaken to regulate the rates to be charged by fire insurance companies for insurance. The companies contended that the act was unconstitutional and void as offending the due process clause of the Fourteenth Amendment. To support their contention the companies asserted that the business of fire insurance was a private one and therefore the State was without power to fix the rates for the service; that to exercise such right would be a taking of private property for a public use; that the business of insurance is a natural right receiving no privilege from the State; that the contracts of insurance are voluntarily entered into and cannot be compelled. Mr. Justice McKenna, in delivering the opinion of the court, asks whether a contract of fire insurance is private and as such has constitutional immunity from regulation. In other words, is the business of fire insurance so far affected with a public interest as to justify legislative regulation of its rates? He asserts "that a business, by circumstances and its nature, may rise from private to be of public concern, and be subject in consequence, to governmental regulation," and finally he concludes that the business of fire insurance is affected with a public interest and therefore its rates are subject to State regulation. It was argued there, just as it is argued here, that to uphold the act would have the effect of subjecting to regulation every act of human endeavor and the price of every article of human use but the court said in answer to that argument: "We might, without much concern, leave our discussion to take care of itself against such misunderstanding or deductions. The principle we apply is definite and old, and has, as we have pointed out, illustrating examples. And both of the expressions of principle and the citation of the examples we have tried to confine our decision to the regulation of

the business of insurance, it having become 'clothed with a public interest,' and therefore subject 'to be controlled by the public for the common good.' "

Mr. Justice Lamar wrote a dissenting opinion in the case. He used arguments quite similar to those used by Mr. Justice Field in his dissent in the *Munn Case,* thirty-six years before. He argued that if a State could, without offending the Constitution, establish insurance rates then it could fix the price of everything and that private business generally will become "the center of a circle of price-making legislation, that in its application, will destroy the right of private property and break down the barriers which the Constitution has thrown around the citizen to protect him in his private property." But after careful consideration the majority of the court upheld the statute notwithstanding the predicted calamities.

The next and last landmark in the law of business regulation and control by the State is the case of *Nebbia* v. *People of State of New York,* 291 U. S. 502, 54 S. Ct. 505, 515, 78 L. Ed. 940, 89 A. L. R. 1469. There the legislature enacted a statute which placed the milk and dairy industry under complete control and provided for the prices to be received by producers for milk and the prices the public should pay to producers or distributors. In the State court, *People* v. *Nebbia,* 262 N. Y. 259, 186 N. E. 694, Chief Justice Pound, for the majority of the court, in delivering the opinion held that the milk or dairy industry was affected with a public interest and that the legislature had the power to regulate it and even fix the prices to be charged.

When the case reached the Supreme Court the old principle that had been applied in the *Munn Case* and the *German Alliance Insurance Company Case,* to the effect that a business had to be affected with a public interest before it could be controlled by State legislation, was abandoned and a new test was applied. The court held that private business could be regulated by legislation which could reasonably be deemed to promote public welfare provided such legislation was not arbitrary or discriminatory; that it must be

conceded that the milk industry is subject to regulation in the public interest, and that there is no constitutional principle which bars a State from correcting existing maladjustments by legislation touching prices provided it is reasonable and the public welfare requires it. It was further held that, "the touchstone of public interest in any business, its practices and charges, clearly is not the enjoyment of any franchise from the State, *Munn* v. *Illinois* [94 U. S. 113, 24 L. Ed. 77], *supra*. Nor is it the enjoyment of a monopoly * * *." And speaking of the phrase "affected with a public interest," the court said:

"The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the State may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells."

Again the court said:

"* * * 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' *Northern Securities Co.* v. *United States,* 193 U. S. 197, 337, 338, 24 S. Ct. 436, 457, 48 L. Ed. 679, 700, 701. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the

adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"The law-making bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to

adopt, and hence an unnecessary and unwarranted inter-
ference with individual liberty."

It will be observed that Mr. Justice McReynolds dissented
in vigorous language using almost the same line of reason-
ing and argument that was used by Mr. Justice Field in the
*Munn Case* and by Mr. Justice Lamar in the *German Al-
liance Insurance Co. Case,* but notwithstanding these views
entertained by Mr. Justice McReynolds, the majority of the
court upheld the New York statute.

As previously stated, it is not necessary to commit this
court to the broad views expressed by Mr. Justice Roberts
in the *Nebbia Case* in order to uphold the Virginia act.
That case, however, is authority for the view that the milk
industry may be regulated, even to the extent of fixing
prices, if the public interest demands it.

In Virginia the industry has been subjected to many rules
and regulations for many years. In fact at the time the
present act was passed the industry was already controlled
by the State in nearly every respect except in the field of
prices. Some of those regulations were that it was neces-
sary to have a permit to sell milk; that certain containers
had to be used and plainly labeled with the name and ad-
dress of the producer; that milk had to be graded and test-
ed; that tuberculin tests had to be applied to the cows; that
cows should be kept in separate barns; that the barns
should be constructed in a certain way and should provide
a certain number of square feet for each cow. Some fifteen
or twenty other regulations were also prescribed covering
nearly the entire field of the dairy industry. The validity
of these many regulations has never been questioned. Can
it be argued that they do not affect private property, but
that a regulation fixing prices does? Can it be said that one
has the natural right to engage in the milk industry when
he is required to secure a permit which may be granted or
withheld? How can it be said that the industry is not af-
fected with a public interest when it is already circum-
vented by so many regulations made for the benefit of the
public? Those regulations constitute restraints upon the

exercise of personal rights for they prohibit one from dealing with his own property freely and as he chooses. Yet no one has asserted that they were void because in violation of some constitutional provision. In Virginia, they have never been challenged so far as we are advised.

There can be no controlling difference between the fire insurance business and the milk industry in so far as regulation and price fixing by the State are concerned. Regulations in both instances limit the control the owners have over their property. If the fire insurance business is affected with a public interest, then surely the milk industry is so affected.

The legislature has declared the milk industry of the State to be affected with a public interest. It has found and established the facts upon which the declaration is based. The allegations of the bill contain pertinent facts to support the conclusion. Neither the facts established and declared by the legislature nor those alleged in the bill have been denied. There are no facts before this court upon which we could conclude that the milk industry is not affected with a public interest. If the Commission promulgates unreasonable, arbitrary, or foolish regulations the courts may be depended upon to declare them void. Future arbitrary regulations may be invalid without affecting the constitutionality of the act.

Our conclusion is that the Virginia act is constitutional.

It is argued that the act is invalid because it authorizes the levying of an assessment without giving any notice thereof. The act provides that the Milk Commission shall prepare an annual budget and collect such sums as are needed for operating the Commission from the local milk boards by way of monthly assessments and the local boards are required to pay the assessments. The amount is limited to a sum not exceeding two cents per hundred pounds of milk handled in each market. The local milk boards meet their expenses and the assessments levied upon them by the Commission, by levying an assessment upon the producers

and distributors. The local boards determine the amount of each monthly assessment necessary to cover expenses. The assessments are limited to cover the actual expense of operation. The distributors, under the act, provide the local boards with a report of the quantity of milk handled and from this report the assessment is made. In other words the distributor makes his own return from which it is determined the amount he is to pay. He then charges each producer according to the weight of the milk purchased from each. Under these circumstances the distributor and the producer do not need formal notice. They know at all times that an assessment will be made and they can, periodically, determine for themselves just how much it will be. In addition to this, it is quite clear that the assessment is not the levying of a tax, nor is the act a revenue measure. It is merely incident to the regulation, and is proper under the police power of the State. *Robinson* v. *City of Norfolk*, 108 Va. 14, 60 S. E. 762, 15 L. R. A. (N. S.) 294, 128 Am. St. Rep. 934; *Phoebus* v. *Manhattan Social Club*, 105 Va. 144, 52 S. E. 839, 8 Ann. Cas. 667; 26 R. C. L. pp. 20, 21, 22.

The cases cited by the appellant are not in point because they involve a tax of some kind levied for the purpose of raising revenue for general purposes.

It is urged that because the Commission is granted power to "make, adopt and enforce all rules, regulations and/or orders necessary to carry out the purposes of this act," this is the delegation to the Commission of the power to enact legislation which is both prohibitory and penal in character and which will be operative only in such milk areas as the Commission may define.

In *Turner* v. *Com.*, 149 Va. 468, 141 S. E. 128, a conviction for violating a regulation of a legislative board was affirmed by this court. The Supreme Court, in the *Nebbia Case*, upheld a similar provision. The New York act, section 304, delegates to the Milk Board the power to promulgate orders and rules which have the effect of law. Section 308 is a grant of power to the board to issue licenses,

and to suspend or revoke all licenses. A violation of an order of the board is made a misdemeanor. In addition to a criminal prosecution, the act provides for an injunction, as in the case of the Virginia act. The license provision of the Virginia act is not challenged in this proceeding. However, the act provides that refusal or revocation of a license may be reviewed by this court.

The appellants here have not applied to the Milk Commission to have any rule or order it may have issued corrected or invalidated. No objection to any order or rule has been pointed out to the Commission and it has had no opportunity to make any correction of its erroneous orders, if any such orders have been issued.

"Where one complains that regulations promulgated under legislative authority by a State board are unreasonable and oppressive, he should seek relief by applying to that board to modify them." *Petersen Baking Co.* v. *Bryan, Governor,* 290 U. S. 570, 54 S. Ct. 277, 279, 78 L. Ed. 505, 90 A. L. R. 1285. There is no suggestion here that if the appellants had sought relief of the Milk Commission, their request would not have been fairly heard or that they would have been denied any relief to which they may have been entitled.

Our view of the Virginia act is that it does not contravene either the Federal or the Virginia Constitution, and this being true the legislature had the power to provide for an injunction to restrain a violation of the act.

*Affirmed.*

HOLT, HUDGINS and CHINN, JJ., dissenting.

The following opinion was originally delivered and adopted by the court as of November 15, 1934, but upon a rehearing it was overruled.

HOLT, J., dissenting:

The Milk Commission of Virginia is declared to be an instrumentality of the Commonwealth by an act of the

General Assembly, approved March 29, 1934, Acts 1934, chapter 357, page 558. That act authorized it to divide the State into "markets" or "milk sheds," and to fix a maximum and minimum price for milk within these designated areas. It further provided that it shall have control over the production of milk and may require that distributors be licensed by it. A distributor is defined as one who sells milk to consumers. A consumer is one, other than a milk distributor, who purchases milk for human consumption and a producer-distributor is one who sells milk produced by himself. When a market has once been defined, producers can sell only within that market subject to this exception only: If at the time of its establishment they are shipping milk to any other market they may continue to do so until that custom is voluntarily abandoned.

Acting under powers conferred it has set apart Augusta county and designated it as "Staunton-Waynesboro Production Area," and that area is divided into the Waynesboro market and the Staunton market.

The defendants in the court below, called defendants here, are farmers of Augusta county who live upon their farms, keep cows for dairy purposes and sell their milk to customers in Staunton under permits from health authorities. In other words, they are ordinary farmers who conduct ordinary dairies and who comply with all sanitary regulations designed to make their milk wholesome. Their business has been conducted in a manner satisfactory to themselves and to their customers for a number of years. Now they are ordered to advance prices to Staunton customers, many of whom have notified them that they are unable to pay these advances and must discontinue their purchases. For these and other reasons they have refused to adopt the scale of prices fixed by the Commission and have refused to apply for any license from it to do business.

In this state of affairs the Commission has sought an injunction in which it asks that the defendants "may each be enjoined and restrained from distributing milk in the

city of Staunton until they, or each of them, shall have applied for and received a license from the Commission, and, further, from selling milk in said markets at any other price than that fixed by the Commission, or violating any other rule or regulation of the Commission; * * *."

They, by way of answer, challenged the constitutionality of the act. This cause came on to be heard; the trial court was of the opinion that an injunction should issue in accordance with the prayer of the bill and decreed accordingly. That order is now before us on appeal. The Commonwealth contends that it is a proper exercise of police power.

That power is an attribute of sovereignty and is inherent in government. We have unnumbered definitions. Our court, speaking through Judge Keith, in *C. & O. R. Co.* v. *Commonwealth*, 105 Va. 297, 54 S. E. 331, 333, cited with approval this definition by Mr. Justice Harlan in *Chicago, B. & Q. Ry. Co.* v. *Illinois ex rel. Drainage Comm'rs*, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175. "The police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety," subject of course to constitutional limitations and to the inalienable rights of citizens.

The underlying governing principles are not particularly obscure, but it is their application to changing conditions which troubles us.

This definition by Judge Cooley has met with wide approval: He says that the police power of a State "embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others."

It is not contended that the health or morals of the community are here involved. Ample sanitary regulations appear in chapter 51 of our Code [section 1154(1) *et seq.*]. The defendants say that they have complied with them and this statement is not denied. The Commission, in its bill, tells us what the trouble is. It "alleges that R. J. Reynolds, C. H. Miller and J. C. Montgomery are now selling fluid milk in the city of Staunton without having obtained a license as provided by the act of 1934 and that they are selling contrary to and below the prices established in the rules and regulations of the Commission established for the Staunton-Waynesboro market and have been doing so since the effective date of such regulations as of July 22, 1934; and have declared their intention to refuse to pay assessments as printed in regulation number six."

Courts should not travel beyond the record, but they should not affect to be ignorant where the matter is one of common knowledge. We know that producers have participated in organized blockades of centers of consumption, and in the prosecution of their purpose milk trucks have been overturned and their contents wasted. It has not been suggested that this was done to protect the health or morals of the city. Plainly it was an economic struggle. This struggle, happily divested of lawlessness in Virginia, is voiced in the act in judgment. What the legislature undertook was to make the dairy business profitable, and this it sought to accomplish by fixing the price of its products.

The Commission may order milk to be sold at one price in Staunton, at another in Harrisonburg and may leave Woodstock to shift for itself. The State is interested in the health of all its people and not in that only of those who may chance to live in some undesignated milkshed. Each citizen is entitled alike to its solicitous care. Not that the same measures must everywhere be adopted, but that such precautions shall everywhere be taken as appear necessary. It is not enough that sanitation is merely incidental; it must have been intended to be effected. It is perfectly clear that there was no intention to mark out milk-

sheds where milk is not produced as a commercial commodity. The statement in the bill that it is designed to promote public health and public peace is but a makeweight. But if it were not it still could not be coupled with a price-fixing provision unless the industry was affected with a public interest. While courts uphold statutes where it is possible, they should give valid reasons for their judgments and not excuses.

The dairy business is a major industry and all would like to see it prosper, but the means adopted, defendants say, so far as they are concerned, are producing an opposite result. Customers who bought at profitable prices no longer buy at all.

Section 1 of our Bill of Rights declares: "That all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity, namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety."

The same idea appears in the Declaration of Independence where it is said:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness."

Bryce, The American Commonwealth, vol. 1, page 438, in commenting, said:

"The Bill of Rights is historically the most interesting part of these Constitutions, for it is the legitimate child and representative of Magna Charta, and of those other declarations and enactments, down to the Bill of Rights of the Act of 1 William and Mary, session 2, by which the liberties of Englishmen have been secured," and adds:

"Thirty-one States declare that 'all men have a natural, inherent, and inalienable right to enjoy and defend life and liberty'; and all of these, except the melancholy Missouri, add the 'natural right to go pursue happiness.' "

Some contend that these articles are but declarations of general principles rather than positive grants of power and for this reason are to be more liberally construed. This is not the law in Virginia and our Bill of Rights is as much a part of our Constitution as the first ten amendments to the Federal Constitution are a part of it. *Brooks* v. *Town of Potomac,* 149 Va. 427, 141 S. E. 249. We might cite many other Virginia cases to the same effect. Indeed, these enumerated inherent and inalienable rights would still be protected had they never been named.

"The bill of rights though incorporated into and made a part of the present Constitution, has the same force and authority which it has always had, neither more nor less, as containing the recognized and fundamental principles of a well regulated government. It is an authoritative affirmation of certain general principles, and a declaration of the political rights and privileges which it is the duty of the government to secure to the people." *Ruffin's Case,* 21 Gratt. (62 Va.) 790.

In *Richmond, F. & P. R. Co.* v. *City of Richmond,* 145 Va. 225, 133 S. E. 800, 803, this court, speaking through Judge Burks, said: "Man as an individual possesses certain rights which are called inherent rights, inborn and inbred, the gift of his Maker, and essential to his existence and well-being, such as the rights of life, liberty and the pursuit of happiness, which are not surrendered by entering into organized society. They existed before society was organized and are not surrendered by entering into the organization."

We might add that without them organized society, as we know it, would be impossible. *Lipscomb* v. *Nuckols,* 161 Va. 936, 172 S. E. 886; *Quesinberry* v. *Hull,* 159 Va. 270, 165 S. E. 382.

"Liberty" and the "pursuit of happiness and safety" mean something more than physical freedom and a happy home.

In *Young's Case,* 101 Va. 853, 45 S. E. 327, 328, Judge Harrison said: "The word 'liberty' as used in the Con-

stitution of the United States and the several States, has frequently been construed, and means more than mere freedom from restraint. It means not merely the right to go where one chooses, but to do such acts as he may judge best for his interest, not inconsistent with the equal rights of others; that is, to follow such pursuits as may be best adapted to his faculties, and which will give him the highest enjoyment. The liberty mentioned is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purpose above mentioned. These are individual rights, formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which begins with the fundamental proposition that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness."

In the concurring opinion of Field, J., *Butchers' Union, etc., Co.* v. *Crescent City, etc., Co.*, 111 U. S. 746, 4 S. Ct. 652, 660, 28 L. Ed. 585, he said:

"The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial must, therefore, be free in this country to all alike upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright."

The substance of it all is this: One may, without let or hindrance, follow the ordinary callings of life which are in themselves innocent and which do not injure their neighbors, which do not violate the maxim, *"Sic utere tuo ut*

*alienum non laedas.*" Injury may sometimes follow from legitimate and uncontrollable causes. One department store may be built against another, and in the end, through better management and ampler credit, bankrupt its competitor. This is a hazard incident to every commercial venture, not devoted to a public use.

The production and sale of milk is an immemorial industry, and not until today has it been thought necessary to fix by statute the price of this product.

The Commission is given power to control production. It may say to one, "Your market will not absorb all the milk you are offering for sale. You must produce less." And it may say to another who has grass lands suitable for dairy purposes, "You cannot embark in such a business. Additional production is not needed in your market." It may fix a price so low as to be unprofitable, and it may place it at a point so high as to drive away customers, the exact thing which the defendants say has been done in the instant case. We must look not only to that which has been done but to that which may be done. *Richmond* v. *Carneal*, 129 Va. 388, 106 S. E. 403, 14 A. L. R. 1341. Its rulings may be arbitrary and unjust and yet there is no appeal. It is perfectly true that an appeal, as it is ordinarily understood, is not a part of due process of law, but an appeal to some judicial tribunal is necessary before private property can be destroyed. Proper exercise of police power is subject to supervision of the courts. *Bowman* v. *Virginia State Entomologist*, 128 Va. 351, 105 S., E. 141, 12 A. L. R. 1121.

We do not for a moment minimize the value of police power. Without its free use a sovereign State could not function and those settled principles upon which it rests may be applied from day to day as new conditions demand, but it cannot undermine the inalienable right of citizens and it cannot override constitutional guaranties. *Buck* v. *Bell*, 143 Va. 310, 130 S. E. 516, 51 A. L. R. 855; *Strawberry Hill Land Corp.* v. *Starbuck*, 124 Va. 71, 97 S. E. 362; *Shenandoah Lime Co.* v. *Governor of Virginia*, 115 Va. 865, 80 S. E. 753, Ann. Cas. 1915C, 973.

Before private business can be regulated it must be affected with some public interest.

Chief Justice Taft in *Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522, 43 S. Ct. 630, 632, 67 L. Ed. 1103, 27 A. L. R. 1280, has classified those cases so affected. They are:

"1. Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"2. Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or colonial legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs, and gristmills. * * *

"3. Businesses which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly."

The first and second classes need not be noted.

He went on to say that while the public is in some measure concerned with all lawful business and may suffer, for example, from high prices, that does not affect it with a public interest, and that:

"It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator, or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regula-

tion." And this, though the products of the butcher shop, food for human consumption, is everywhere used and is the subject of strict sanitary regulations.

In *Fairmount Creamery Co.* v. *State of Minnesota,* 274 U. S. 1, 47 S. Ct. 506, 508, 71 L. Ed. 893, 52 A. L. R. 163, a statute was under review which declared that purchasers of milk, cream or butter-fat should not pay different prices for these products in different parts of the State. This of course was price fixing in a modified form. The court said: "Looking through form to substance, it clearly and unmistakably infringes private rights whose exercise does not ordinarily produce evil consequences, but the reverse."

In *Williams* v. *Standard Oil Co.,* 278 U. S. 235, 49 S. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596, it was held that the sale of gasoline was affected with no public interest. The court said: "It is settled by recent decisions of this court that a State legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest'."

*New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 52 S. Ct. 371, 372, 76 L. Ed. 747, deals with the attempt of a State to control the manufacture and sale of ice. Ice is of course widely used and when made from impure water is a carrier of noxious germs. The court held that this business was private and was not affected with the public interest and in the course of its opinion said: "It must be conceded that all businesses are subject to some measure of public regulation. And that the business of manufacturing, selling, or distributing ice, like that of the grocer, the dairyman, the butcher, or the baker, may be subjected to appropriate regulations in the interest of the public health cannot be doubted; * * *."

That is to say milk and ice are placed upon a common footing and the dairyman, the butcher and the baker, are cited as types and models of those whose business is essentially private.

The Supreme Court in *Tyson & Brother—United Theatre*

*Ticket Offices* v. *Banton,* 273 U. S. 418, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236, undertook to define "public interest" and said:

"A business is not affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease, or enjoyment from the existence or operation of the business; and, while the word has not always been limited narrowly as strictly denoting 'a right,' that synonym more nearly than any other expresses the sense in which it is to be understood."

And again: "The significant requirement is that the property shall be devoted to a use in which the public has an interest, which simply means, as in terms it is expressed at page 130 [of *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77], that it shall be devoted to a 'public use.' Stated in another form, a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been *devoted* to a public use and its use thereby, in effect, *granted* to the public."

These reasons and these definitions still hold. A man who milks one cow and sells the milk to one man has not devoted that product to public use, and the situation is not changed because he milks two cows and sells to two men. "A business is not affected with a public interest merely because it is large."

Section 11 of our present Constitution provides that "no person shall be deprived of his property without due process of law," and the same provision appears in the Fifth and Fourteenth Amendments to the Federal Constitution. With us it first appears in the Constitution of 1902. If it can be said to have been adopted from these Federal provisions, we must endeavor to ascertain how they have been construed by the Federal courts before our adoption, for if it was so copied the construction theretofore given to it would attach.

*Hoffer Bros.* v. *Smith,* 148 Va. 220, 138 S. E. 474; *Big Jack Overall Co.* v. *Bray,* 161 Va. 446, 171 S. E. 686.

*Case of the State Freight Tax,* 15 Wall. 232, 21 L. Ed. 146, was decided by the Supreme Court in 1872. It was there held that the right of one to charge what he pleases for his property or its use is an attribute of ownership. In *Tyson & Brother—United Theatre Ticket Offices* v. *Banton,* 273 U. S. 418, 426, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236, the court was dealing with a statute affecting the price and sale of theatre tickets, and said: "In the endeavor to reach a correct conclusion in respect of this inquiry, it will be helpful, by way of preface, to state certain pertinent considerations. The first of these is that the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, *Case of the State Freight Tax,* 15 Wall. 232, 278, 21 L. Ed. 146, and, as such, within the protection of the due process of law clauses of the Fifth and Fourteenth Amendments." That is to say, that this right had been thus construed before our Constitution of 1902 had been adopted and was in its adoption protected, subject to such limitations only as then existed.

In the late case of *Nebbia* v. *People of State of New York,* 291 U. S. 502, 54 S. Ct. 505, 507, 78 L. Ed. 940, 89 A. L. R. 1469, a New York statute, in many respects like that in judgment, was upheld, and *People* v. *Nebbia,* 262 N. Y. 259, 186 N. E. 694, was affirmed. Before this case can be considered as controlling authority it is necessary to know just what was decided. The court tells us: "The question for decision is whether the Federal Constitution prohibits a State from so fixing the selling price of milk. We first inquire as to the occasion for the legislation and its history."

It held that there had been no invasion either of the Fifth or of the Fourteenth Amendments of the Federal Constitution, and that is all which it undertakes to hold.

It is, of course, controlling authority in its construction of the Federal Constitution. An opinion by a divided court on matters decided is as controlling as a unanimous judg-

ment. But where, as here, the decision is one of five to four, its persuasive influence by virtue of its judgment alone is not strong. It may or may not be convincing. Certainly four dissenting justices were of opinion that it took advanced ground and overruled its own previous and well considered judgment. However this may be, we are left free to adopt those conclusions which appear to be best supported when we come to pass upon our own constitutional provisions, and this with all deference to that great tribunal. In the majority opinion *Munn* v. *Illinois, etc.,* 94 U. S. 113, 24 L. Ed. 77, is strongly relied upon as authority to support the provision that sales prices of ordinary commodities may be fixed by statute.

There the court was called upon to decide if the State of Illinois could, by statute, fix a maximum charge for the storage of grain in a public warehouse.

The Constitution of that State (Const. Ill. art. 13, sec. 7) made it the duty of the General Assembly to pass laws "for the protection of producers, shippers and receivers of grain, etc.," and so the statute was passed under an express grant of power written into the State Constitution that, of course, was not violated. The court held that these public warehouses were devoted to a public use and were, therefore, affected with a public interest, but there could have been no intention to hold that all things used generally by the public were so affected for it has since expressly held, for example, that gasoline is not. The test is this, the thing affected must to some extent at least be devoted to a public use. Unless all distinctions are to be wiped away, the distinction between a public use and a general use must be observed as was pointed out by Mr. Justice McReynolds in the *Nebbia Case,* who said:

"The painstaking effort there to point out that certain businesses like ferries, mills, etc., were subject to legislative control at common law and then to show that warehousing at Chicago occupied like relation to the public would have been pointless if 'affected with a public interest' only means that the public has serious concern about the

perpetuity and success of the undertaking. That is true of almost all ordinary business affairs."

The man who sells milk has no more devoted it to a public use than has the salesman of ice or meat devoted his ware.

In the *Munn Case* it is interesting to note that wheat was not declared to be a commodity devoted to a public use but only the instrumentality through which it was handled.

Since the case in judgment was argued, the Supreme Court has handed down a decision as of November 5, 1934, in *Hegeman Farms Corp.* v. *Baldwin,* 293 U. S. 163, 55 S. Ct. 7, 8, 79 L. Ed. 29. A minimum price for the sale of milk was fixed by the Milk Control Board, which, by reason of competition, was the maximum price at which dealers could sell. The court said that "the fact is of critical importance that there has been no attempt by the Board to fix a maximum price in respect of any of the transactions subject to its regulatory power." The complaining dealer did not charge more for his products because he was prevented from doing so by competition, and he charges that the minimum price made his business unprofitable. The court said: "If the designation of a minimum price is within the scope of the police power, expenses or losses made necessary thereby must be borne as an incident, unless the order goes so far beyond the needs of the occasion as to be turned into an act of tyranny. Nothing of the kind is charged. The Fourteenth Amendment does not protect a business against the hazards of competition. *Public Service Comm. of Montana* v. *Great Northern Utilities Co., supra,* at p. 135 of 289 U. S., 53 S. Ct. 546 [77 L. Ed. 1080]. It is from hazards of that order, and not from restraints of law capriciously imposed, that the appellant seeks relief. The refuge from its ills is not in constitutional immunities." It affirmed the *Nebbia Case,* for of course that case is now controlling authority in that court. We think that it has no new force or authority on the problem now before us.

If the sale and consumption of milk is affected with a public interest, it is difficult to see why all food products in

principle are not subject to like public supervision. Those from the butcher shop and from the sea are everywhere sold, and consumed. They rapidly deteriorate, and yet such a claim as to them has so far not been advanced and cannot be sustained unless private control of private business is at an end.

We have had but one case which deals with a legislative attempt to fix prices, *Young's Case, supra.* There a statute said that trading stamps should not be given. These stamps were of value and amounted to a rebate on sales prices. The court held that the price or manner in which a merchant saw fit to sell his goods could not be regulated to statute, and said:

"We think it is clear that such a prohibition is an unwarranted interference with the individual liberty which is guaranteed to every citizen, both by our State Constitution and also by the Fourteenth Amendment to the Constitution of the United States. * * * This inalienable right is trenched upon and impaired whenever the legislature prohibits a man from carrying on his business in his own way, provided always, of course, that the business and the mode of carrying it on are not injurious to the public, and provided also that it is not a business which is affected with the public use or interest."

The statute undertakes to justify itself by stating that we suffer from an "economic emergency." It would be dangerous to hold that constitutional guaranties were effective only in fair weather, when there is no reason to invoke them. They should stand four-square to all the winds that blow. It is for that purpose that they were written. They serve to curb the heated impulses of the people and to give time in which to form a sober judgment. If they fail in this, they are not worth the ink that prints them. When proven to be oppressive they may be changed by orderly constitutional processes provided.

In *Goddin* v. *Crump,* 8 Leigh (35 Va.) 120, the court said:

"It must be admitted that at the institution of civil gov-

ernment founded on the rights of all, the will of the majority must prevail over the opinions and interests of the minority; but when such government is established, its great object is to protect the rights of the minority from the tyranny of the majority—a tyranny more inflexible and implacable than the tyranny of a single despot. In the one case the majority feels no sympathy for the minority. In the other case the sufferers have the sympathy of the majority of their fellow subjects, and the force of public opinion may redress their wrongs. To effect this relief against the tyranny of majorities, written constitutions were devised by the American people."

*Taylor* v. *Stearns*, 18 Gratt. (59 Va.) 244, deals with the question of the constitutionality of an act passed by the legislature at its session in 1865-66. This act established a moratorium against the foreclosure of deeds of trust until January 1, 1868. Conditions were then distressing, but were of no avail. The court said:

"Great as might be the sufferings growing out of a judicial sentence against this law, and wide-spread as might be the ruin of individuals and the sacrifice of property under it, they are not, for one moment, to be compared with the evils likely to attend the demoralizing example of a judiciary seeking, however covertly, popular favor by some skillfully disguised compromise of its highest and most imperious duty—that of disdaining every pretext, however plausible, and withstanding every temptation, however strong, to betray, in the slightest particular, the requirements of the State and Federal Constitutions."

In *State* v. *Stewart*, 54 Mont. 504, 171 Pac. 755, 757, Ann. Cas. 1918D, 1101, the court said:

"Whatever is legally done by any public agency at any time must be done either with the sanction or without the inhibition of the Constitution; for, like the national charter, it 'is a law for rulers and people, equally in war and peace, and * * * no doctrine involving more pernicious consequences was ever invented by the wit of man than that any

of its provisions can be suspended,' without its authority for any reason."

To the same effect is the judgment in the great case of *Ex Parte Milligan,* 4 Wall. 2, 18 L. Ed. 281, delivered when passions were high and when emergencies were deemed to be great. War itself cannot change the legislature's constitutional powers. *U. S.* v. *L. Cohen Grocery Co.,* 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045.

Indeed emergencies or fancied emergencies constantly arise and for the time ·absorb our attention and we are prone to "view them with alarm." Within the lives of living men has been witnessed the period of reconstruction, the panic of 1873, and others scarcely less distressing. Years of plenty and lean years come down in long procession. Problems that today seem portentous are by the next generation as forgotten as Pharaoh's famine.

Again the act in judgment by its terms was to remain in effect until repeal or until terminated by a proclamation of the Governor. Of course the Governor can no more repeal a law than he can enact one and so we have a legislative declaration of a permanent emergency. An emergency calling for legislative relief is a present pressing necessity; indefinitely prolonged, it drifts into a normal condition and so the statute in judgment is not an emergency statute at all.

Under the statute and under the court's decree these defendants must secure licenses from the Commission before they can do business at all. If refused, they may appeal to the court, but there are no rules with which they must comply before a license can be obtained. And so upon appeal they cannot state wherein the Commission held they had failed to qualify. They are left, so far as the law is concerned, to guess at its reasons, adequate or inadequate. In such circumstances there would be nothing left for the court to pass upon. It could not assume as a matter of law that the Commission had erred and so the right of appeal is but a promise to the ear.

Neither rights nor property can be confiscated except af-

ter judicial hearing and after a proper notice. *Boggs* v. *Commonwealth,* 76 Va. 989; *Fugate* v. *Weston,* 156 Va. 107, 157 S. E. 736.

In *Thompson* v. *Smith,* 155 Va. 367, 154 S. E. 579, 584, 71 A. L. R. 604, under review was an ordinance of the city of Lynchburg. That ordinance declared that it should be unlawful for any person, other than a transient, to operate a motor vehicle upon the city streets until he had secured a permit from the chief of police, whose duty it was to carefully examine the applicant as to his qualifications. No permit was to issue until he had satisfied himself by such examination that the applicant could safely and properly operate a car upon the city streets and was familiar with the traffic laws in the State and city. And he was authorized to revoke any permit given where the driver, in his opinion, had become unfit to exercise the privilege granted. This court, speaking through Epes, J., said:

"It is a fundamental principle of our system of government that the rights of men are to be determined by the law itself, and not by the let or leave of administrative officers or bureaus. This principle ought not to be surrendered for convenience or in effect nullified for the sake of expediency. It is the prerogative and function of the legislative branch of the government, whether State or municipal, to determine and declare what the law shall be, and the legislative branch of the government may not divest itself of this function or delegate it to executive or administrative officers."

He pointed out that, "The majority of the cases lay down the rule that statutes or ordinances vesting discretion in administrative officers and bureaus must lay down rules and tests to guide and control them in the exercise of the discretion granted in order to be valid, * * *."

He quoted with approval this statement of the law from *Mutual Film Corp.* v. *Industrial Commission of Ohio,* 236 U. S. 230, 239, 35 S. Ct. 387, 392, 59 L. Ed. 552, Ann. Cas. 1916C, 296:

"The legislature must declare the policy of the law and

fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply."

Of course details must be left to administrative bureaus, but the policy of the law in general terms must be declared for its guidance. If left to arbitrary discretion we have a government of men and not of laws. Guided by these principles the court in the *Thompson Case* was of the opinion that the principles under which permits were to issue were sufficiently stated, but that none in detail or in general terms were set out which could guide in their revocation and this notwithstanding the liberality of the rule which obtained in the exercise of police power. *Taylor* v. *Smith*, 140 Va. 217, 124 S. E. 259.

These principles are applicable to the case in judgment.

The Commission may issue or refuse a license, but no legal principles are stated which are to control its judgment although its refusal might bankrupt an applicant.

Finally, it is contended that none of the principles stated apply to the sale of milk; that it is sacrosanct and is a food for babies. Certainly as a dairy product it is not their primary food though its substitutional use is wide if not universal. Wide use commonly accompanies a public use, but does not necessarily make it so. Warmth is necessary for the health of infants, and if a supply of fuel were cut off in bitter weather they would probably suffer quite as much as they would if they were denied milk from dairies for a like period of time; and yet it is not claimed that fuel in its varied forms has ever been devoted to a public use. Another answer to this claim is that no one has ever suggested that its sale be forbidden. Indeed, the plaintiffs here are contending that it has actually been curtailed because of the high price at which they are told to sell.

We are told that these views are antiquated, outmoded, unsuited to the more abundant life that lies before us, and should be filed away in some museum of impossible loyalties. But they are of ancient origin and have hitherto met

every test, theoretical and pragmatic. They are written into our Constitution and are not to be put away by construction. They have in "high cabal made us what we are."

From the opinion of the court, as adopted on March 29, 1935, the following memorandum of dissent was filed:

MEMORANDUM OF DISSENT, HOLT, J.

To hold the act in judgment constitutional one at least of two conclusions is necessary. It must be designed to protect public health, or the production and sale of milk must be affected with a public interest.

Heretofore we reached the conclusion that the first claim was a makeweight. It but gives an odor of sanctity to an act whose plain purpose was to make the production of milk profitable, and this conclusion has been strengthened by subsequent developments. If we are to accept as true uncontradicted statements in the public press, the Milk Commission, since the decision of November 15, 1934, has been kept alive by private contributions certainly not made by consumers.

This action is, in substance, brought by the State of Virginia through an instrumentality of its own, and yet it is a matter of common knowledge that the State itself is purchasing milk produced beyond its borders, bought to be consumed by its blind wards. Of course it would not have them drink that which endangered their health, and yet it gives to them milk whose production is not supervised by this Commission. The answer is that such supervision is wholly unnecessary.

As a matter of fact the reason for this purchase in West Virginia is that the West Virginia producer is willing to undersell and does undersell his Virginia competitor who stands upon the higher price which the Commission's ruling has enabled him to exact. A large consumer can take advantage of this situation; a small one cannot.

In the cases of *Baldwin, Commissioner* v. *G. A. F. Seelig,*

*Inc.,* and *G. A. F. Seelig, Inc.* v. *Baldwin, Commissioner,* decided by the United States Supreme Court on March 4, 1935 (U. S.), 55 S. Ct. 497, 79 L. Ed. 525, that tribunal refused to interfere with the sale of milk produced in Vermont and brought to New York. The New York Commission refused to permit such a sale unless the importers would sign an agreement to conform as to price with the New York statute. This they would not do. Of course if the New York statute was of necessity a sanitary measure enacted in good faith to protect the people's health, importation could be prohibited. This suggestion the Supreme Court brushed aside, holding it to be in substance, though not in terms, a makeweight.

If there is in this act no genuine effort to promote the people's health, then to sustain it we must hold that the production and sale of milk is a business affected with a public interest. A business is affected with a public interest when it is devoted to a "public use." *Tyson & Bro.— United Theatre Ticket Offices* v. *Banton,* 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236. In *Chas. Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522, 43 S. Ct. 630, 632, 67 L. Ed. 1103, 27 A. L. R. 1280, Chief Justice Taft thus states the test:

"In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulations to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly."

Not until now has it been held that one who milks his cow and sells his milk has thereby lost the right of private control and has devoted this business, simple and ancient, to a public use.

It may be conceded that price fixing is not at all times and in all circumstances unconstitutional. Some great emergency may clothe with a public interest matters which are ordinarily the subject of private control. In a famine speculators might corner foodstuff and imperil all the peo-

ple. It would, under such conditions, be clothed with a public interest. But such regulations must be designed to promote the interest of the people generally and not the interest of a favored class. A further illustration of this principle is given by housing laws recently upheld. They are distinctly in the interest of people at large who must have a place in which to live, and are not designed to enable landlords to take advantage of their necessities. "Plainly circumstances may so change in time or so differ in space as to clothe with such an interest what at other times and in other places would be a matter of purely private concern." *Block* v. *Hirsh,* 256 U. S. 135, 41 S. Ct. 458, 459, 65 L. Ed. 865, 16 A. L. R. 165.

Those who produce milk for sale are relatively few in number. Its consumption in some form is fairly universal. Public interest is not advanced by statutes designed to limit production at the expense of a helpless public. The fact that a license is necessary and that it may be revoked practically at pleasure tends to monopoly and to limit control to present producers. Monopolies are not favored.

It is true that courts hesitate to declare statutes unconstitutional. They should be still more reluctant to cut away those landmarks of individual rights reaffirmed both in the Bill of Rights and in the Declaration of Independence, charters indigenous to this Commonwealth and which have heretofore been by us so stoutly maintained.

For these reasons and for those stated by us in our original opinion, I am constrained to dissent from the conclusions which this court has now reached.

HUDGINS AND CHINN, JJ., concur in this dissent.